E. T. USHER AND DOROTHY H. USHER, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent; HENRY M. FRAZEE AND PATRICIA A. FRAZEE, Petitioners v. COMMISSIONER OF INTERNAL REVENUE, Respondent
Usher v. Commissioner
Docket Nos. 141-79, 142-79.
United States Tax Court
T.C. Memo 1980-180; 1980 Tax Ct. Memo LEXIS 403; 40 T.C.M. (CCH) 385; T.C.M. (RIA) 80180; May 21, 1980, Filed Thomas G. Christmann, for the petitioners. Lewis J. *404 Hubbard, Jr., for the respondent. DAWSON
MEMORANDUM FINDINGS OF FACT AND OPINION DAWSON, Judge:In these consolidated cases respondent determined the following deficiencies in the Federal income taxes of petitioners: Petitioners
Dkt. No.
Year
Deficiency
E. T. Usher and
1973
$ 4,350
Dorothy H. Usher
141-79
1974
30,379
Henry M. Frazee and
1973
$ 2,153
Patricia A. Frazee
142-79
1974
13,355
The issues for decision are: 1. Whether petitioners were grantors of an option, and, if so, whether they received ordinary income under section 1234 [1] in 1973 to the extent of the option price paid and retained upon the failure of the optionee to exercise the option to purchase land. 2. Whether petitioners received ordinary income in 1974 from a forfeited security deposit plus accrued interest paid as liquidated damages for breach of contract to purchase land. 3. Whether section 1341, which provides a special computation of tax where the taxpayer restores a substantial amount *405 held under a claim of right, is available to petitioners as a result of their settlement payment to a plaintiff in a case seeking to enforce their contractual obligation to purchase land. FINDINGS OF FACT Some of the facts have been stipulated. The stipulation of facts and supplemental stipulation, together with the attached exhibits, are incorporated herein by this reference. Petitioners E. T. Usher (Usher) and Dorothy H. Usher, are husband and wife, who were legal residents of Chiefland, Florida, when they filed their petition in this case. Petitioners Henry M. Frazee (Frazee) and Patricia A. Frazee, are husband and wife, who resided in Gainesville, Florida, when they filed their petition herein. This case arises from the contractual relations among petitioners and three other parties concerning some 8,064 acres of Florida timberland. On July 9, 1973, Hudson Plup and Paper Corporation (Hudson) granted an option to Usher to purchase the property. The option agreement between Hudson and Usher provided in part: OPTION AGREEMENT
* * *
That on this 9th day of July, 1973, HUDSON PLUP & PAPER CORP., * * * hereinafter called the "OPTIONOR", in consideration of *406 the sum of Fifty Thousand Dollars ($50,000) received from ETTER T. USHER, * * * hereinafter called the "OPTIONEE", hereby gives and grants unto the Optionee the right and privilege and option of purchasing within the time period hereinafter stated, for the purchase price of Three Million Four Hundred Twenty-Seven Thousand Two Hundred Dollars ($3,427,200), subject to the terms and conditions hereinafter stated, that certain real property in Dixie County, Florida, * * *: 1. The Optionee will pay the purchase price of Three Million Four Hundred Twenty-Seven Thousand Two Hundred Dollars ($3,427,200) by paying Fifty Thousand Dollars ($50,000) as the consideration for this option and by paying the balance thereof in cash at date of closing. * * * 2. The term of said option shall be one hundred eighty (180) days from the date hereof. 3. In the event the Optionee elects to exercise said option he shall give the Optionor written notice of such election by certified mail * * *: If the optionee shall not deliver said notice as prove provided during said term, said option to purchase shall terminate and the Fifty Thousand Dollars ($50,000) consideration paid for this option shall *407 be nonrefundable. In the event that the Optionee shall deliver said notice as provided for herein, said Fifty Thousand Dollars ($50,000) consideration shall be deducted from the purchase price as provided for in paragraph 1 above. * * *
On the same day, July 9, 1973, Usher executed a document captioned "Assignment of Option to Purchase" wherein he transferred a 25 percent interest in th Hudson Option to Frazee. [2]
*408 Soon thereafter Usher and Frazee sought a buyer who would purchase their rights under the option for the purpose of making a profit between the price negotiated with the buyer and the price set forth in the Hudson Option. On August 31, 1973, Usher and Frazee, joined by their wives, executed an agreement with Owens-Illinois, Inc. (Owens) captioned "OPTION" where, in consideration of $50,000, they gave Owens the exclusive privilege of purchasing from August 31, 1973 until November 1, 1973 the Hudson Option, i.e., Owens had an option to buy another option. The Owens Option provided that: (1) The Hudson Option was deemed deficient by Owens in a number of particulars and that Usher promised to deliver to Owens an Amended Option Agreement (Amended Hudson Option) which met Owens' stated specifications. (2) If petitioners failed to deliver the Amended Hudson Option by September 29, 1973, they had to notify Owens that they would close with Hudson and then convey the subject property to Owens in accordance with Owens' stated specifications. (3) If petitioners failed to deliver the Amended Hudson Option and failed to notify Owens that they would close with Hudson and convey the *409 subject property to Owens in accordance with Owens' stated specifications, then Owens at its choice could terminate its option with petitioners, and petitioners would have to refund to Owens the $50,000. (4) "In the event Owens exercises this Option, Owens shall, at closing with Hudson, be entitled to deduct from the amount due Hudson, the $50,000 option money paid by Usher to Hudson." (5) "In the event this Option is not exercised by Owens as aforesaid, then this agreement shall be void and neither party shall have any obligation one to the other hereunder and * * * [petitioners] shall keep the $50,000 paid for this Option." In October 1973, Usher and Hudson executed an agreement which amended and modified the July 9, 1973 Hudson Option to substantially meet Owens' specifications.
By the end of 1973, with the Hudson Option about to terminate, Owens had not yet exercised its option. On January 3, 1974, a few days before the expiration date, Usher and his joint ventures elected to exercise his option with Hudson. The option then ripened into a purchase and sales agreement. The option given by petitioners to Owens was not exercised, and the $50,000 was retained by them. *410 Usher used his share to pay off a note and Frazee put his share in the bank.
Petitioners then sought a new buyer. On February 16, 1974, they entered into an agreement captioned "Assignment of Option to Purchase" with BEKO, Inc., (BEKO). The assignment agreement provided in part: that Etter T. Usher, Henry M. Frazee * * * parties of the first part, in consideration of the sum of * * * $10 * * * and other good and valuable consideration to them in hand paid by BEKO, Inc., a Florida Corporation, party of the second part * * * do grant, bargain, sell, assign, transfer and set over unto said party of the second part all their rights, title and interest in, to and under that certain Option to Purchase and all amendments thereto, dated July 9, 1973, by and between Hudson Pulp and Paper Corp., a Maine Corporation, as Optioner and Etter T. Usher as Optionee. * * *
The party of the second part [BEKO], by his acceptance of this Assignment, agrees to assume all of the obligations and duties of the Optionee under said Option Agreement, and all amendments thereto, to hold and save harmless the parties of the first part [petitioners] from any and all further liability or legal obligation *411 of any kind whatsoever under said Option Agreement and all amendments thereto and to consummate the purchase contemplated thereunder in accordance with the terms and conditions thereof. Also a February 16, 1974, petitioners and BEKO entered into a contract for the sale and purchase of the July 9, 1973 Hudson Option as amended on October 25, 1973. The consideration was to be a 640 acre section of land which was a parcel of the 8,064 acres of land subject to the Hudson Option. The 640 acres were to be deeded to petitioners when BEKO closed on the entire Hudson Option property with Hudson. [3]
*412 In addition, the contract required BEKO to place $150,000 in escrow as a guaranty for performance. If BEKO performed on the contract with Hudson and deeded the 640 acres to petitioners, the $150,000 would be returned to BEKO. If BEKO did not perform, then the $150,000 would be forfeited. The contract specifically provided: 4. SECURITY FOR PERFORMANCE: To further secure and guaranty that Buyer will consummate the sale contemplated under the herein described Option Agreement and the amendments thereto, and thereafter deliver title to Section 25, Township 12 South, Range 12 East, Dixie County, Florida, to the Seller as provided for hereunder. Buyer agrees, simultaneously with the execution of this Contract, to deliver in cash or by certified or cashiers check $150,000.00 as a guaranty for performance hereunder. Said security deposit shall be deposited into an interest bearing account with an Ellis National Bank of the Buyer's choice in Tampa, Florida, pursuant to an Escrow Agreement which shall provide that if the Buyer, upon acquiring title from Hudson Pulp and Paper Corporation, shall fail to convey to the Seller hereunder by Warranty Deed, the herein described lands, then *413 the Escrow Agent shall be empowered to immediately pay over to Seller the entire $150,000.00 security deposit together with all accrued interest thereon as liquidated damages in full and complete settlement of all damages suffered by Seller by reason of the Buyer's failure to perform, or Seller shall have the right to pursue such other remedies as may be available under the law, including but not limited to a suit for specific performance. In the event for any reason Hudson Pulp and Paper Corporation does not stand ready, able and willing to convey fee simple title to said lands then and in that event the Escrow Agent shall return said escrow deposit to BEKO, Inc., or if Buyer fully performs under the terms of the Option Agreement and this Contract, then, immediately upon delivery of the Warranty Deed by Buyer to Seller as required hereunder, the Escrow Agent shall be authorized to deliver to Buyer said security deposit together with all accrued interest thereon, and the Escrow Agent shall thereafter be relieved of further obligation under the Escrow Agreement. The contract further provided as follows: 6. REAL ESTATE COMMISSION: The parties hereto acknowledge that a real *414 estate commission of $200,000 has been earned in connection with the sale contemplated hereunder. Buyer agrees to assume all responsibility and liability for payment of said real estate commission and to indemnify and hold and save harmless the Seller from any and all liability therefor. * * *
9. OTHER AGREEMENTS: This Contract constitutes the entire agreement between the parties, and any changes, amendments or modifications hereof shall be null and void unless same are reduced to writing and signed by the parties hereto. As part of the transaction with petitioners, BEKO placed $150,000 in an escrow account with the Ellis National Bank. On February 16, 1974, a document captioned "Letter of Escrow Agreement" was signed by the executive vice-president of Ellis National Bank acknowledging the receipt of $150,000 in the form of a cashier's check delivered by BEKO and agreeing to hold the same in escrow in an interest bearing account for the benefit of BEKO to be disbursed in the following manner: (1) If and when petitioners receive fee simple title to the property described by the contract for sale and purchase dated February 16, 1974 the escrow amount plus accrued interest *415 would be disbursed to BEKO; or (2) the principal amount with interest would be disbursed to petitioners if (a) BEKO did not acquire the fee simple title to the land described despite the fact that Hudson stood ready, able and willing to convey or (b) BEKO, after acquiring title, failed or refused to convey fee simple title to petitioners and they elected to pursue other remedies as outlined in the contract for sale and purchase. BEKO did not perform on the contract with Hudson. The $150,000 was released from escrow and disbursed to petitioners in 1974. Usher combined his share of the $150,000 with some prior savings and bought a certificate of deposit. Frazee put his share into a savings account. Although petitioners elected to exercise their option causing it to ripen into a contract to purchase the property from Hudson, they did not perform on their contractual obligations. Petitioners also failed to have Owens and BEKO close on the property. On November 29, 1974 Hudson filed suit against Usher in the United States District Court for the Northern District of Florida, Gainesville Division. The case was docketed as Case No. GCA 74-41. Hudson sued for specified performance *416 of the July 9, 1973 agreement as amended and modified on October 25, 1973. Usher filed his answer to Hudson's complaint based on two defenses. First, he denied that Hudson was ready, willing and able to comply with the terms of the agreement, and thus claimed he was not in default. Second, he alleged that he had previously acted as Hudson's agent in selling property and he did not intend, nor did he understand that Hudson intended, that he would be personally bound and obligated to purchase the property. In response to Usher's answer Hudson filed a motion to strike Usher's second defense. The District Court granted Hudson's motion but permitted Usher to amend his answer. Usher filed an amended answer which substantially reiterated and elaborated upon the previously striken defense that the parties did not intend that Usher be personally bound by their written agreements. Hudson thereafter prepared a memorandum in support of another motion to stricken claiming that Usher was attempting "to alter and rewrite the express terms of a written agreement when there is no ambiguity or uncertainty in the agreement," and citing several persuasive Florida cases to that effect. In *417 April, 1975, petitioners and Hudson reached an agreement to settle the litigation. Hudson executed a release, dated May 5, 1975 which provided: WHEREAS, HUDSON PULP & PAPER CORP. and ETTER USHER entered into a certain option agreement as amended under the terms of which HUDSON claimed that USHER was legally liable as set forth and alleged in that certain suit now pending in the United States District Court for the Northern District of Florida, Gainesville, Division, the same Case No. GCA 74-41. NOW, THEREFORE, HUDSON PULP & PAPER CORP., in full accord and satisfaction of said suit and disputed claim does hereby acknowledge the receipt of the sum of $200,000.00 cash, in hand paid, in consideration of which and for other good and valuable consideration, HUDSON does hereby remise, release and forever discharge the said ETTER USHER, his agents, servants, employees and assigns from any and all actions, causes of action, claims, or demands for, upon, or by reason of any damage or which heretofore has been or which hereafter may be sustained by HUDSON or any other person or persons having any legal interest in consequence of said disputed claim and resulting damages, if any; And that *418 the undersigned expressly stipulate and agree in consideration of the aforesaid payment, that said suit be dismissed in accordance with Stipulation of Dismissal dated April 30, 1975, and to indemnify, defend and forever hold harmless the said USHER, his agents, servants, employees, and assigns against loss from any and all future claims, demands, or actions, including all expense, costs and attorneys' fees reasonably incurred for either negotiation, trial or appeals resulting therefrom, that may hereafter at any time be made or brought against any of them by HUDSON or by anyone claiming by, through or under HUDSON for the purpose of enforcing a further claim on account of the damage sustained in or arising from the aforesaid claim. ULTIMATE FINDINGS OF FACT 1. Petitioners had an unrestricted right to receive $50,000 from Owens as a result of the failure of Owens to exercise its option. 2. Petitioners had an unrestricted right to receive and use the $150,000, plus accrued interest, received from BEKO upon its failure to consummate the land sale from Hudson. 3. In the taxable year 1973 the petitioners received ordinary income of $50,000 because of Owens' failure to exercise *419 the option granted by petitioners. 4. In the taxable year 1974 the petitioners received ordinary income of $150,000 because of BEKO's failure to consummate the purchase of property from Hudson. OPINION Issue 1--Option Income
Section 1234 provides for the tax treatments of gains and losses attributable to options to buy or sell property. Section 1.1234-1(b), Income Tax Regs., provides that "any gain to the grantor of an option arising from the failure of the holder to exercise it is ordinary income." On August 31, 1973, petitioners executed an agreement with Owens, captioned "OPTION", that in consideration of $50,000 gave Owens the exclusive right for a stated period of time to purchase the Hudson Option. Owens failed to exercise its option. The money was retained by petitioners. They had complete dominion and control over the funds. Usher used his share to pay off a note and Frazee put his share in the bank. Petitioners, however, assert that section 1234 and the regulations thereunder are not applicable to them. They liken themselves to real estate agents who attempt to sell property by writing up a sales contract with the seller and then go out to find *420 a purchaser. In such a situation, they contend, the sales contract is usually signed by the prospective purchaser and the real estate agent, and a binder, or a payment making an agreement binding until the completion of a formal contract, is taken. Under petitioners' analysis, if the deal goes through, the real estate agent gets a commission and the cash binder goes to the seller to reduce the purchase price or is returned to the purchaser; if the deal does not go through, the binder goes to the seller unless the contract provides otherwise. They argue that although real estate agents may have physical access to the binder money, they have no legal right to the funds and thus do not have to include such sums in their income. Petitioners boldly deny that the $50,000 they received from Owens in consideration for signing a carefully drafted agreement captioned "OPTION" was, in fact, the purchase price of an option. They testified that the sum was simply an agent's binder. On brief they state that the "paper work was written to look like the $50,000 was a payment for an option but testimony clearly shows it was a common binder." Thus, they maintain that if Owens had performed *421 they would have received a commission and the $50,000 would have gone to reduce the purchase price; and if Owens had not performed "the paperwork showed the $50,000 would go to petitioners but both petitioners and Hudson knew this was not the case." They argue they never had any legal right to the $50,000 because when Hudson sued them for specific performance on their contract to purchase the subject land, the amount Hudson accepted in settlement was equal to the sum of the amounts petitions received from Owens ($50,000) and BEKO ($150,000). We think the petitioners' self-serving testimony that the $50,000 was merely an agent's binder is not credible in view of the overwhelming documentary evidence to the contrary. Petitioners did as they saw fit with the amount received from Owens and they were under no constraints as to its utilization at the time of receipt. Throughout the trial the petitioners testified that they were merely Hudson's real estate agents and were not principals. Yet they signed a clearly drafted option agreement with Hudson. They paid Hudson $50,000 for the right to purchase the subject land. Such actions clearly show that the petitioners were principals, *422 not agents. Nordblom v. Commissioner,15 T.C. 220 (1950). After they exercised the Hudson Option according to its terms, they were sued by Hudson as principals for specific performance to purchase the property. We note that petitioners failed to call anyone from Hudson as a witness in this case who might have corroborated any such alleged agency relationship. Hence we infer that any such testimony would have been unfavorable to petitioners. Stoumen v. Commissioner,208 F.2d 903, 907 (3d Cir. 1953), affg. a Memorandum Opinion of this Court. See also Wichita Terminal Elevator Co. v. Commissioner,6 T.C. 1158, 1165 (1946), affd. 162 F.2d 513 (10th Cir. 1947).
Whatever the petitioners' mental reservations and innermost intentions about being real estate agents may have been, their actions were different. In Jeffries v. Commissioner,158 F.2d 225 (5th Cir. 1946), affg. 5 T.C. 1338 (1945), cert. denied 330 U.S. 843 (1947), the Court of Appeals said: Whether a transaction or result is taxable and what the tax is is not a matter to be determined in law upon considerations of *423 general justice or equity. It is a matter of statutes and valid regulations, and what they mean. Neither is it to be determined in fact upon considerations of what was intended to be done. Rather it is to be determined by what was done. * * * Taxation deals not with what was attempted to be done but with what was done. * * * [158 F.2d at 226].
Accordingly, we hold that the petitioners received income in the amount of the $50,000 they received for the option which Owens failed to exercise. Issue 2--Liquidated Damages Income
Amounts received as liquidated damages for failure of a buyer to complete a contract for the purchase of property are generally treated as income to the payee in the year of forfeiture. Harrison v. Commissioner,7 T.C. 1, 4 (1946). Such liquidated damages are taxable as ordinary income. Boatman v. Commisisoner,32 T.C. 1188, 1191 (1959). See also Smith v. Commissioner,50 T.C. 273 (1968), affd. per curiam, 418 F.2d 573 (9th Cir. 1969); Binns v. United States,385 F.2d 159 (6th Cir. 1967). By the end of 1973, with the Hudson Option about to terminate, *424 Owens had not yet exercised its option. Petitioners thought there was still a chance that Owens or some other company would want the property, so they took a calculated risk. On January 3, 1974, just before the expiration date, Usher and his joint venturers elected to exercise the Hudson Option causing it to ripen into an enforceable sales contract. When Owens failed to exercise its option with petitioners to take over the property, petitioners sought a new buyer. By February 16, 1974 petitioners found a new buyer, BEKO, and entered into an assignment of, and a contract for the sale and purchase of, the Hudson Option. The consideration was a 640 acre section of the 8,064 acres of land subject to the Hudson Option. The 640 acres were to be deeded to petitioners when BEKO closed on the Hudson Option. The contract further provided that BEKO has to place $150,000 in escrow as a guaranty for performance. If BEKO performed on the contract with Hudson and deeded the 640 acres to petitioners, the $150,000 would be returned to BEKO. If BEKO did not perform, then the $150,000 would be forfeited to petitioners as liquidated damages. BEKO did no perform and the escrow agent disbursed *425 the $150,000 and accrued interest to petitioners. Usher combined his share with some prior savings and bought a certificate of deposit. Frazee put his share into a savings account. Petitioners reassert their argument that they were merely Hudson's real estate agents as to the BEKO transaction. They argue that, if the deal had gone through, they would have received a commission; and, if the deal had not gone through, the $150,000 would have gone to Hudson and not to them. Here again the facts belie such contentions. BEKO failed to complete its contractual obligations and forfeited the $150,000 plus accrued interest. The escrow agent disbursed the funds not to Hudson but to petitioners. Neither acted like an agent turning over funds to his principal. When Hudson sued petitioners for specific performance under the July 9, 1973 agreement as amended and modified on October 25, 1973, petitioners alleged such an agency relationship but Hudson strongly denied in Federal court pleadings that any such agency existed. The contracts between BEKO and petitioners and those between Hudson and petitioners did not create a principal-agent relationship but were contracts between independent *426 principals. Usher described his occupation as a "farmer, rancher and timberman"; Frazee described his occupation as "a manager, farmer, cattleman, timberman." At no time did petitioners introduce any evidence that they were licensed real estate salesmen or brokers. Moreover, their claim that they were working merely for a real estate commission is not supported by the evidence. Their contract with BEKO stated that the consideration to them was a 640 acre parcel of land. The contract further stated that a $200,000 real estate commission was earned and that BEKO would pay it and "indemnify and hold and save harmless the Seller [petitioners] from any and all liability therefor." Their reasoning would require a nonsensical reading of that provision so as to hold harmless the real estate agent from paying his own commission. Petitioners' case is entirely based on their own self-serving testimony, which at times was inconsistent and totally uncorroborated. Where a taxpayer has entered into a written agreement that provides for the specific terms of a transaction, the tax consequences of which are in issue, we have applied the rule that "strong proof" must be adduced by the taxpayer *427 if he seeks to establish a position at variance with the language of the agreement to which he was a party. Lucas v. Commisisoner,58 T.C. 1022, 1032 (1972); Ullman v. Commissioner,29 T.C. 129 (1957), affd. 264 F.2d 305 (2d Cir. 1959). Here we think the petitioners have failed to establish by "strong proof", or for that matter even by a preponderance of the evidence, that the money they received as a result of BEKO's failure to keep its contractual obligations was anything other than liquidated damages taxable as ordinary income in the year of receipt. We so hold. Issue 3--Applicability of Section 1341
In the alternative, petitioners contend that if the amounts received from Owens and BEKO in 1973 and 1974 respectively, are includable in their income, they should be allowed to use the tax computation permitted by he provisions of section 1341. [4]
*428 Section 1.1341-1(a)(1), Income Tax Regs., provides in part: If, during the taxable year, the taxpayer is entitled under other provisions of chapter 1 of the Internal Revenue Code of 1954 to a deduction of more than $3,000 because of the restoration to another of an item which was included in the taxpayer's gross income for a prior taxable year (or years) under a claim of right, the tax imposed by chapter 1 of the Internal Revenue Code of 1954 for the taxable year shall be the tax provided in paragraph (b) of this section. Section 1.1341-1(a)(2), Income Tax Regs., provides that: For the purpose of this section 'income included under a claim of right' means an item included in gross income because it appeared from all the facts available in the year of inclusion that the taxpayer had an unrestricted right to such item, and 'restoration to another' means a restoration resulting because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or (portion thereof). We have previously concluded that the petitioners had an unrestricted right to the option income item ($50,000) in 1973 and to the *429 liquidated damages income item ($150,000) in 1974. Section 1341(a)(1). Thus, the availability of section 1341 to petitioners turns on whether "it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item * * *" [Emphasis added]. Section 1341(a)(2).
Petitioners argue that when they paid Hudson $200,000 in 1975 in settlement Hudson's suit for specific performance regarding the property they were actually repaying to the true recipient monies which they received under a claim of right. We disagree and reject the argument. Section 1341 does not apply where the taxpayer did, in fact, have an unrestricted right to receive the amount in the prior year and the obligation to repay arose as a result of subsequent events. In Blanton v. Commissioner,46 T.C. 527, 530 (1966), affd. per curiam 379 F.2d 558 (5th Cir. 1967), this Court held and stated that: Under section 1341(a)(2), the requisite lack of an unrestricted right to an income item permitting deduction must arise out of the circumstances, terms, and conditions of the original payment of such item to the taxpayer *430 and not out of circumstances, terms, and conditions imposed upon such payment by reason of some subsequent agreement between the payor and payee. See also Pahl v. Commissioner,67 T.C. 286 (1976); Pike v. Commissioner,44 T.C. 787 (1965); Rev. Rul. 67-48, 1967-1 C.B. 50. According to the circumstances, terms, and conditions of the Owens and BEKO agreements, petitioners were never obligated at any time to return any portion of the Owens lapsed option payment or the BEKO liquidated damages payment to Hudson. It was only after petitioners were sued by Hudson for specific performance to purchase the property that they entered into a specific dollar settlement agreement. On brief the petitioners make the oxymoronic argument that the "facts show that when Hudson demanded the $50,000 (in rather a forceful manner) by suing for specific performance, petitioners paid it over to Hudson. The same situation happened when BEKO entered the picture * * *. If the deal did not go through the $150,000 would be forfeited, not to petitioners but to Hudson." This is incorrect. First, Hudson did not sue petitioners to recover the money they kept when *431 Owens let its option lapse or the money they received as liquidated damages when BEKO breached its contract with them. Rather Hudson sued petitioners for specific performance to force them to buy the land. The fact that the $200,000 petitioners paid Hudson in settlement of the specific performance suit happened to equal the sum of the $50,000 they received from Owens' lapsed option payment and the $150,000 they received from BEKO's liquidated damages payment is irrelevant. Second, their contract and escrow agreements with BEKO provided that any liquidated damages were to go to petitioners, not Hudson, and that the contract voided all oral modifications. Accordingly, we conclude that section 1341 is not applicable in these circumstances. Respondent has acknowledged in his brief that the petitioners are entitled to a loss deduction in 1975 when they made the payment to Hudson as a result of the suit for specific performance. However, such payment cannot be treated as a "restoration" of funds received by petitioners from or on behalf of Hudson. The proper treatment of the loss does not involve computations under section 1341. Decisions will be entered FOR THE RESPONDENT. *432 Footnotes
1. All section references are to the Internal Revenue Code of 1954, as amended and in effect during the years at issue, unless otherwise indicated.↩
2. The document provided in part as follows: ASSIGNMENT OF OPTION TO PURCHASE
KNOW ALL MEN BY THESE PRESENTS, that Etter T. Usher, hereinafter called "party of the first part", in consideration of the sum of Ten and No/100 Dollars ($10.00), lawful money of the United States, and other good and valuable consideration to him in hand paid by Henry M. Frazee and D. E. Williams, [D. E. Williams, a member of the joint venture, is not a petitioner in this case.], hereinafter called "parties of the second part" of or before the unsealing and delivery of these presents, the receipt whereof is hereby acknowledged, has granted, bargained, sold, assigned, transferred and set over, and by these presents does grant, bargain, sell, assign, transfer and set over unto each of the parties of the second part an undivided twenty-five percent (25%) interest in and to that certain Option to Purchase dated July 9, 1973, by and between Hudson Plup and Paper Corp., a Maine Corporation, as Optioner, and Etter T. Usher, as Optionee as said Option to Purchase relates to the lands therein described.↩
3. More fully, the sale and purchase contract provided: 1. PURCHASE PRICE AND METHOD OF PAYMENT: The real property subject to the hereinabove set forth Option Agreement and Admendment thereto comprises a tract of land made up of approximately 8064 acres. Included in said tract of land is Section 25, Township 12 South, Range 12 East, Dixie County, Florida. For and in consideration of the Assignment of said Option Agreement and all amendments thereto, and as payment in full by Buyer to Seller for said Option and all of the Seller's rights, title and interest thereunder, Buyer agrees that, simultaneously with the acquisition by the Buyer of the fee simple title to the lands described in said Option Agreement and all amendments thereto he shall convey to the Seller Section 25, Township 12 South, Range 12 East, Dixie County, Florida by Warranty Deed, free and clear of all liens, encumbrances or other exceptions except those as shown in the Title and Trust Company of Florida Title Insurance Binder No. 27600-F, a copy of which is attached hereto and by reference incorporated herein and made a part hereof. The conveyance to seller of the fee simple title to said property shall constitute full consideration and payment for all rights, title and interest of Seller in, to and under the herein described Option Agreement and all amendments thereto, and all deposits paid by Seller as Optionee to the Optionor there under shall accrue to the benefit of Buyer. 2. CONVEYANCE:↩ The Seller agrees to convey all of his rights, title and interest in, to and under the herein described Option Agreement and all amendments thereto to BEKO, Inc. and/or its assigns by properly executed Assignments of Option, free and clear of any and all liens and encumbrances, and specifically warranting that Seller has exercised his option to purchase under said Option Agreement, and that said Option Agreement is in full force and effect and in no way in default. Buyer agrees to accept the Assignment of said Option Agreement, to assume all of the obligations and duties of the Optionee thereunder, to hold and save harmless the Seller from any and all further liability or legal obligation of any kind whatsoever thereunder and to consummate the purchase contemplated under sid Option Agreement in accordance with the terms and conditions thereof.
4. Section 1341 provides the general rule that: If-- (1) An item was included in gross income for a prior taxable year (or years) because it appeared that the taxpayer had an unrestricted right to such item; (2) A deduction is allowable for the taxable year because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item or to a portion of such item; and (3) The amount of such deduction exceeds $3,000, then the tax imposed by this chapter for the taxable year shall be the lesser of the following: (4) The tax for the taxable year computed with such deduction; or (5) An amount equal to-- (A) The tax for the taxable year computed without such deduction, minus (B) The decrease in tax under this chapter * * * for the prior taxable year (or years) which would result solely from the exclusion of such item (or portion thereof) from gross income for such prior taxable year (or years).↩