**DOMINION RESOURCES, INC., Plaintiff,**

v.

**UNITED STATES of America, Defendant.**

**Civ. A. No. 3:97CV326.**

United States District Court, E.D. Virginia, Richmond Division.

March 5, 1999.

Virginia W. Powell, Hunton & Williams, Richmond, VA, Robert Joseph Muething, Hunton & Williams, Atlanta, GA, Winfield L. Ryan, Richmond, VA, for plaintiff.

James J. Wilkinson, U.S. Department of Justice, Tax Division, Washington, DC, Joan E. Evans, U.S. Attorney's Office, Richmond, VA, Alan J.J. Swirski, U.S. Department of Justice, Tax Division, Washington, DC, for defendant.

## MEMORANDUM OPINION

PAYNE, District Judge.

Dominion Resources, Inc. ("DRI") instituted this action against the United States (the "IRS"), seeking a refund of federal taxes for the 1991 tax year, asserting four distinct tax claims. Having compromised Counts Three and Four of the original Complaint, DRI filed an Amended Complaint presenting only two counts.

In Count One of the Amended Complaint, DRI seeks a refund because the IRS erroneously refused to allow DRI's subsidiary, Virginia Power Company, to use 26 U.S.C. § 1341 ("Section 1341") in calculating its tax liability for 1991. The parties agree that if the IRS erroneously

refused to apply Section 1341, the amount of the refund is $1,204,283.

Count Two seeks a refund on the theory that DRI is entitled to a deduction for expenses incurred by Dominion Lands, Inc. ("DLI"), another DRI subsidiary, in cleaning up environmental contamination on property formerly owned and operated by Virginia Power as an electric power generating station. That property, known as the 12th Street Station, was transferred to DLI as part of the corporate reorganization by which DRI was formed to become Virginia Power's holding company. Count Two seeks to recover $762,359 which is the agreed refund owed if DRI is entitled to a deduction for these clean-up expenses. The Court, sitting without a jury, heard evidence and argument on these issues.

## FINDINGS OF FACT: COUNT ONE

The facts are largely undisputed and most have been set forth in the joint stipulation of facts. (Pl.'s Trial Ex. 68.) Those, and the findings respecting the few disputed facts, are set forth below.

DRI is a Virginia corporation, which owned, directly or indirectly, all the outstanding common stock of Virginia Power and DLI at all times relevant to this action. Virginia Power generates, transmits, and distributes electricity to customers in Virginia and North Carolina. The company is a public service corporation which is organized under the laws of the Commonwealth of Virginia and which is subject to regulation by the Virginia State Corporation Commission ("VSCC"), the North Carolina Utilities Commission ("NCUC"), and the Federal Energy Regulatory Commission ("FERC") (collectively, the "Regulatory Authorities").

Between 1975 and 1987, Virginia Power collected revenues from its customers under rates approved by the Regulatory Authorities. The basis for those rates was the estimate of Virginia Power's cost of service in generating and transmitting electricity. Cost of service includes opera-tional and maintenance expenses, depreciation and amortization, taxes, working capital, and costs of invested capital. Virginia Power's projected federal income taxes were a component of the cost of service estimate in every relevant year.

Virginia Power's projections of federal income taxes for ratemaking purposes consisted of a "current" component and a "deferred" component. The "current" component for a particular year represented the amount of federal income tax which Virginia Power expected to pay on its projected revenue amounts for that year. In contrast, the "deferred" component for a particular year represented the amount of future federal income tax that Virginia Power estimated it would be required to pay with respect to the projected revenue amounts for that year.

The deferred component is the subject of Count One. The deferred component consists of estimated taxes paid with respect to either: (1) income received in a current year that is deferred for income tax purposes to a later year; or (2) deductions in later years that are accelerated into a current year. Both deferred income and accelerated deductions result in differences between income for financial reporting purposes and income for income tax purposes, and those differences are referred to as "book-tax timing" differences or as "temporary differences."

The FERC accounting rules, NCUC's accounting rules, and Generally Accepted Accounting Principles (GAAP) require the establishment and maintenance of deferred tax accounts. Pursuant to those rules and principles, DRI maintained, at all relevant times, a Deferred Tax Account which was adjusted on an annual basis, and which represented the net cumulative amount of federal income tax expected to be paid in future years.

During the years 1975 through 1987, Virginia Power increased the Deferred Tax Account by the amount of the taxes related to net income accrued for ratemak-

ing purposes as opposed to net income accrued for tax purposes. In each of those years, Virginia Power decreased the Deferred Tax Account by the amount of the taxes that were paid with respect to net income that had been accrued for ratemaking purposes in earlier years but not accrued for tax purposes in those earlier years. Virginia Power expected to pay the deferred taxes in future years when the book-tax timing differences associated with the deferred taxes were reversed. When deferred taxes are actually paid, the Deferred Tax Account is reduced by a corresponding amount. In general, if tax rates remain constant, a book-tax timing difference that results in an addition to the Deferred Tax Account in an earlier year will be offset completely by a corresponding decrease in the Deferred Tax Account in a later year, when the book-tax timing difference is reversed.

When the Regulatory Authorities approved rates based on the projected cost of service, (which included deferred taxes), there existed the possibility that the federal corporate income tax rates governing those deferred taxes would change before Virginia Power was required to pay those federal income taxes. There also existed a possibility that the Regulatory Authorities would later revise the approved rates. Thus, when the Regulatory Authorities approved the rates which could be charged by Virginia Power, it was uncertain whether Virginia Power ultimately would owe an amount of federal income taxes equal to the amounts collected on the basis of those rates.

At all times relevant, the Regulatory Authorities had the authority to require Virginia Power to return to its customers any amounts collected based on a cost of service which included deferred taxes if the Deferred Tax Account became overstated by reason of a reduction in the federal corporate income tax rates. Also, if the Deferred Tax Account became excess, Virginia Power was required under 18 C.F.R. Section 35.24(c) (formerly Sec-

tion 35.25(c)), a FERC regulation, to adjust the income tax component of its cost of service to reflect any excess deferred taxes such as the excess caused by the reduction in federal corporate income tax rates under the Tax Reform Act of 1986. The FERC regulation provided, in pertinent part:

If, as a result of changes in tax rates, the accumulated provision for deferred taxes becomes deficient in or in excess of amounts necessary to meet future tax liabilities as determined by application of the current tax rate to all timing difference transactions originating in the test period and prior to the test period ... The public utility must compute the income tax component in its cost of service by making provision for any excess or deficiency in deferred taxes ...

Furthermore, under a FERC rule reported at 52 Fed.Reg. 24987 (1987), Virginia Power was required to establish a plan to return any excess balance in the Deferred Tax Account to its customers. That plan could take the form of a refund, a reduction of rates, or an offset against an increase in a different item in Virginia Power's cost of service.

With respect to excess deferred income taxes, the Regulatory Authorities had authority which included the following: (a) they could order Virginia Power to issue an immediate refund to its customers; (b) they could order Virginia Power to reduce future rates charged to its customers; and (c) they could offset the tax savings arising from the excess deferred taxes against increases in other "costs of service" at its next ratemaking proceeding.

In general, the federal corporate tax rate used to compute the amount of Virginia Power's deferred taxes during the years 1975 through 1987 was the statutory tax rate in effect at that time, which was at least 46% in every year except 1987 when the rate was 39.95%. Under the Tax Reform Act of 1986, the maximum corporate tax rate was reduced from 46% to 34%, effective on July 1, 1987. Therefore, the

company's expected future tax liability was revised downwardly to conform with the Tax Reform Act of 1986 and, as a result, on July 1, 1987, there arose an excess balance in the Deferred Tax Account.

The excess occurred because Virginia Power was no longer expected to pay the full amount of the deferred taxes that had previously been added to the Deferred Tax Account. The excess amount in the Deferred Tax Account was generally equal to the difference between the expected future tax liability relating to book-tax timing differences, computed at the 46% corporate tax rate, and the revised expected future tax liability on those items computed at the 34% corporate tax rate. The excess amount originally had been included in the Deferred Tax Account during the years 1975 through 1987.

The Tax Reform Act of 1986 penalized a utility if it immediately refunded "protected" excess deferred taxes, which generally related to book-tax timing differences arising from accelerated tax depreciation and the reversal of those timing differences. In 1991, FERC and NCUC issued orders which provided that Virginia Power was required to "refund" to its customers the remaining (or "unprotected") portion of the "excess" deferred taxes attributable to those jurisdictions. The NCUC order provided that "[t]he Company should refund to its customers in a lump sum payment the amount of excess deferred income taxes collected by the Company ..." and the FERC order directed that "the Company will refund the following amounts representing the unprotected excess deferred tax deficiency ..."[1] The refunds ordered by the NCUC in the amount of $5,494,113 were made within 60 days.

The authority by which the NCUC ordered the 1991 refunds was further explained in a Declaratory Order issued March 27, 1996, which provided in part as follows:

> ... This declaratory order explains the background of that order [the 1991 refund order] and the Commission's authority relating to the refund of excess deferred taxes.
>
> \* \* \* \* \* \*
>
> Deferred income taxes are an element of expense included in a public utility's operating expenses for purposes of setting rates in North Carolina. Provisions for deferred income taxes in rates are, of necessity, a matter of estimate since the resulting deferred income tax liability will not be paid until future periods, and is subject to change in the interim.
>
> \* \* \* \* \* \*
>
> ... if the Commission utilizes, for ratemaking purposes, a reserve method of accounting for a particular expense item or category of expenses, the Commission has the authority in ratemaking proceedings to prospectively reduce this reserve to what it concludes is an appropriate level. This adjustment can be accomplished through either an onging (sic) [ongoing] reduction in rates or a one-time refund to ratepayers.

*In re N.C. Power,* 1996 WL 191061No. E–22, sub. 363 (NCUC, March 27, 1996). The total of all refunds ordered by NCUC and FERC was $10,058,336.[2] Of that amount, approximately $8,653,336 came from unprotected excess deferred taxes and approximately $1,423,000 came from protected excess deferred taxes.

Refunds were made by wire transfers to customers, checks to customers, or one-

---

1. The refunds ordered by the FERC consisted of (a) refunds totaling $2,401,000 to wholesalers of electricity and (b) refunds totaling $2,163,223 to military service customers, whose rates by contract are based on FERC's rate orders for Virginia Power. The total refunds ordered by FERC ($4,564,223) were paid within sixty days.

2. The VSCC also ordered refunds but they are the subject of a separate action styled *Dominion Resources, Inc. v. United States,* Civil Action No. 3:98cv793.

time credits to customers' bills. For the most part, refunds were issued to the customers of Virginia Power during a specified 12 month period ending shortly before the refund was made. The amount of the refund to a particular customer was based on the amount of electricity provided to that customer during the specified 12 month period. Some of Virginia Power's customers during the years 1975 to 1987 did not receive refunds in 1991 because they had moved out of Virginia Power's service territory before 1990. Some of the customers who received refunds were not customers of Virginia Power during the years 1975 to 1987 because they had moved into Virginia Power's service territory after 1987.

According to Stuart Bolton, the Virginia Power controller for financial, regulatory, and tax accounting, it would not have been practical to make the refund to past customers who were no longer in the service area. Nor would it have been possible to determine a precise measurement of the refund to such customers. Boulton testified, however, that the refunds were made to the same customer classes from which Virginia Power had originally received payment of the rates in effect from 1975 to 1987. Boulton explained that it was not industry practice to attempt precise matching of customers to refunds of this nature. Moreover, according to Bolton, other electrical power companies utilized the same procedure used by Virginia Power to deplete the excess from its Deferred Tax Account. Thus, customers who had left the Virginia Power service area by 1990 likely would have received a refund from another electrical power company because the change in the federal corporate tax rate created an industry-wide circumstance respecting excess deferred taxes.

Virginia Power paid interest to its customers on part, but not all, of the refund of unprotected excess deferred taxes. North Carolina customers received interest, at the rate of 10%, on the portion of excess deferred taxes relating to an abandoned plant for the period from July 1, 1987 through the refund date. North Carolina customers did not receive interest on the portion of the excess deferred taxes that did not relate to the abandoned plant. However, North Carolina customers also received interest, at the rate of 10%, on the protected excess deferred taxes from July 1, 1987, until the refund date. Virginia Power paid no interest on the refunds ordered by FERC.

The maximum federal corporate income tax rate was 34% when, in 1991, Virginia Power paid refunds in the amount of $10,058,336. In 1991, Virginia Power paid federal income taxes of $4,624,117 on the funds used to make the refund payments. In accordance with FERC bookkeeping directives, DRI recorded the refund of excess deferred taxes in 1991 in its accounting records as a reduction of revenues.

The parties agree that, if Virginia Power is entitled to the application of Section 1341 for the refunds paid in 1991, Virginia Power is entitled to a refund of $1,204,283.

## CONCLUSIONS OF LAW: COUNT ONE

The 1991 income taxes at issue in Count One were assessed in accordance with 26 U.S.C. § 6203. The applicable federal corporate tax rate was 46% for most of the 1975–1987 tax years when Virginia Power collected the $10,058,336 in the deferred taxes which were refunded in 1991. However, the applicable tax rate in 1991, when Virginia Power made the refund, was 34%. Rather than applying Section 1341 to compute Virginia Power's new tax liability on the refund to customers, the IRS instead used the 34% tax rate applicable in 1991 and allowed Virginia Power a tax benefit of $3,419,834 as to the amount of excess taxes refunded to its customers. Virginia Power paid taxes at the 46% rate on the income which became the 1991 refund and contends that, if Section 1341 had been applied, the applicable tax rate would have been 46% and that this would have resulted in an income tax paid of $4,624,117 on

the refunded income. Thus, DRI seeks to recover the difference between what the IRS awarded, and what Virginia Power should have been refunded, which is $1,204,283.

The issue for decision then is whether the IRS erred in refusing to apply Section 1341. DRI, of course, bears the burden to prove entitlement to the refund it seeks. *See Winstead v. United States*, 109 F.3d 989, 993 (4th Cir.1997).

The starting point for analysis is the text of Section 1341 which provides relief for a taxpayer who receives income and pays tax on that income in one year, and then is required to pay back the previously reported income in another year. Section 1341 provides that:

**Computation of tax where taxpayer restores substantial amount held under claim of right.**

(a) *General Rule.*—If—

(1) an *item* was *included in gross income* for a prior taxable year (or years) because it *appeared that the taxpayer had an unrestricted right to such item;*

(2) a *deduction* is *allowable* for the taxable year because it was *established after the close of such prior taxable year* (or years) that the *taxpayer did not have an unrestricted right* to such item or to a portion of such item; and

(3) the amount of such deduction exceeds $3,000,

then the tax imposed by this chapter for the taxable year shall be the lesser of the following . . . .

26 U.S.C. § 1341(a)(1–3) (1986) (emphasis added). The IRS has issued regulations to implement the statute. The relevant regulations provide that:

**Restoration of amounts received or accrued under claim of right.**

(a) *In general.*—

(1) *If, during the taxable year,* the taxpayer is *entitled* under the provisions in chapter 1 of the Internal Revenue Code of 1954 to a *deduction* of more than $3,000 *because of the restoration to another of an item which was included in the taxpayer's gross income for a prior taxable year* (or years) *under a claim of right,* the tax imposed by chapter 1 of the Internal Revenue Code of 1954 for the taxable year shall be the tax provided in paragraph (b) of this section.

(2) For the purpose of this section, *"income included under a claim of right"* means an item included in gross income because it appeared from all the facts available in the year of inclusion that the taxpayer had an unrestricted right to such item, and *"restoration to another"* means a restoration resulting because it was established after the close of such prior taxable year (or years) that the taxpayer did not have an unrestricted right to such item (or portion thereof).

26 C.F.R. § 1.1341–1 (1998) (emphasis added).

Section 1341(a) was "enacted to alleviate some of the inequities which Congress felt" had arisen by virtue of the so-called "claim of right doctrine." *United States v. Skelly Oil Co.*, 394 U.S. 678, 681, 89 S.Ct. 1379, 1381, 22 L.Ed.2d 642 (1969). Under that doctrine, a taxpayer who receives income under a claim of right and with no restriction on its disposition is obligated to include the amount in his gross income "even though it may still be claimed that he is not entitled to retain the money, and even though he may still be adjudged liable to restore its equivalent." *North American Oil Consolidated v. Burnet*, 286 U.S. 417, 424, 52 S.Ct. 613, 615, 76 L.Ed. 1197 (1932). The legislative response to *North American Oil* was Section 1341(a) as to which the Senate Finance Committee explained:

Under present law if a taxpayer is obliged to repay amounts which he had

received in a prior year and included in income because it appeared that he had an unrestricted right to such amounts, he may take a deduction in the year of restitution. In many instances of this nature, the deduction allowable in the later year does not compensate the taxpayer adequately for the tax paid in the earlier year.

The House and our committee's bill provide that if the amount restored exceeds $3,000, the taxpayer may recompute the tax for the prior year, excluding from income the amount repaid.

S.Rep. No. 83–1622 at 118 (1954). And, Section 1341(b)(2) makes clear that Section 1341(a) was to be available to regulated utilities when they were required to make refunds of amounts previously collected in rates to their customers.[3]

To satisfy the "unrestricted right" requirement in Section 1341, the taxpayer must prove that it reported an item of income in a prior year because it "appeared" that it had an "unrestricted right to such item," and that it was later established that the claim of right was defective so that, at the time of receipt, it did not, in fact, "have an unrestricted right to such an item." *Bailey v. Commissioner,* 756 F.2d 44, 47 (6th Cir.1985). If the taxpayer satisfies the "unrestricted right" requirement, it also must establish that, under some provision of the Internal Revenue Code, it is entitled to a deduction for the restoration payment in that year. *See Skelly Oil Co.,* 394 U.S. at 683, 89 S.Ct. at 1382; *Bailey,* 756 F.2d at 46.[4]

Thus, in order to prevail on Count One, DRI must show that: (1) the approximately $10 million collected from Virginia Power customers during 1975–1987 was collected under the appearance of an un-

restricted right, and that it was established, in 1991, that Virginia Power did not have an unrestricted right to that income; and (2) the approximately $10 million of payments and credits issued as refunds to customers in 1991 qualifies as a deductible expense under the Internal Revenue Code.

## A. The Appearance of an Unrestricted Right (Section 1341(a)(1))

It is undisputed that, from 1975 through 1987, Virginia Power received from customer payments, *inter alia,* sums attributable to the deferred tax component of its cost of service, as approved by the Regulatory Authorities. It is also undisputed that payments attributable to the deferred tax components were among the gross income reported by Virginia Power in each of those years. Thus, without question, Virginia Power satisfies the first part of Section 1341(a): "an item [the payments received by virtue of the deferred tax component of its cost of service] was included in gross income for a prior taxable year."

■ The question then is whether Virginia Power made that inclusion in gross income in those years "because it appeared that [Virginia Power] had an unrestricted right to such item." The factual record demonstrates that Virginia Power received the deferred tax component of its cost of service estimate because the Regulatory Authorities approved its entitlement to the payment of those sums. Hence, Virginia Power received the funds as a matter of right granted by the Regulatory Authorities. The IRS does not contend that the right was restricted in any ordinary sense of the word. Nor does the record disclose

3. Section 1341(b)(2) precludes resort to Section 1341(a) in certain circumstances by certain taxpayers, but Section 1341(b)(2) makes clear that it does not apply if the deduction "arises out of refunds or repayments with respect to rates made by a regulated public utility." However, in so doing, Section

1341(b)(2) teaches that regulated public utilities are entitled to the benefits of Section 1341(a) even when other taxpayers are not so entitled.

4. The third factor, that the deduction must exceed $3,000, is not at issue in this action.

any such restrictions.[5] Hence, giving the words of Section 1341(a)(1) their ordinary meaning, Virginia Power had an appearance of unrestricted right to the tax component of its costs of service estimate which formed the basis of the rates charged to customers which thereby generated the utility's gross income in each year from 1975 to 1987.

It is, of course, true that Virginia Power knew that action in the future by the Regulatory Authorities could require the utility to refund all or part of the deferred tax thusly collected, if future changes in the tax laws made that appropriate. However, the IRS does not assert that uncertain future contingency as a restriction on the right to the funds in the year in which they were included in gross income.

■ Also, it is undisputed that: (I) in each year from 1975 through 1986, the corporate tax rate was 46%; and (ii) in 1987, it was 39.95%. The Tax Reform Act of 1986 provided that, effective July 1, 1987, the corporate tax rate was reduced to 34% and, as a result, Virginia Power's Deferred Tax Account developed an excess balance which prompted FERC and NCUC, in 1991, to order Virginia Power to make $10 million in refunds to customers. Virginia Power promptly made those refunds. Thus, to use the words of Section 1341(a)(2), it was established in 1991 that Virginia Power did not have an unrestricted right to the deferred tax components which it had included in its gross income from 1975 through 1987.

On the basis of the plain words of the statute, given their ordinary meaning, Virginia Power appeared to have an unrestricted right to the deferred tax component of its customer rates in the year in which the company included that component as part of the gross income which it reported in the years 1975 through 1987. And, it was not until a subsequent taxable year—1991—that the developments of

1987—the effective date of the Tax Reform Act of 1986—were applied by the Regulatory Authorities to establish that Virginia Power's apparently unrestricted right to the included income did not exist.

This set of virtually undisputed facts would seem to satisfy the plain language of Section 1341(a)(1) and (2) (assuming the existence of an allowable deduction, an issue to be discussed below). Or, put another way, giving the statutory terms their plain meaning and applying the law to the undisputed facts, Virginia Power has satisfied "the appearance of an unrestricted right" facet of its claim for refund.

Likewise, the undisputed facts seem to satisfy the controlling Treasury Regulation, which interprets the appearance of unrestricted right language of the statute to mean "income included [in the taxpayer's prior year return] under a claim of right." 26 C.F.R. § 1.1341–1(a)(1) (1998). The regulation then provides that: *"income included under a claim of right* means an item included in the gross income because it appeared from all the *facts available in the year of inclusion* that the taxpayer had an unrestricted right to such item...." *Id.* at § 1.1341–1(a)(2) (emphasis added). Rather clearly, in each year when Virginia Power included the deferred tax component in its gross income, the facts available in that year made out the appearance of an unrestricted right to that component.

Ignoring the plain language of the statute and the controlling regulation, the IRS concluded that DRI did not meet the terms of Section 1341(a) because DRI had an "actual" unrestricted right to the deferred tax component in the years at issue and that, as a consequence, DRI could not have the "appearance" of an unrestricted right. (Def.'s Initial Pre–Trial Br., p. 7; Def.'s Proposed Conclusion of Law No. 3). The IRS finds support for this rather tor-

---

5. No one suggests that the requirements of the Regulatory Authorities and of the GAAP that utilities must maintain deferred tax ac-counts is a restriction on the right of receipt within the meaning of Section 1341(a)(1).

tured reasoning in the opinion of the Tax Court in *Blanton v. Commissioner*, 46 T.C. 527, 1966 WL 1180 (1966) and three of its decisional progeny.

In *Blanton*, the taxpayer received director's fees from a corporation and later entered into an agreement to return them if the IRS subsequently determined that the fees were excessive. The Tax Court interpreted Section 1341 to apply only where the refund or repayment event arises "out of the circumstances, terms, and conditions of the original payment of such item to the taxpayer and not out of circumstances, terms, and conditions imposed upon such payment by reason of some subsequent agreement between payor and payee." *Id.* at 530. The Tax Court then determined that the repayment agreement was not in existence when the taxpayer received the income at issue, but was executed only after the taxpayer had received the director's fees. For that reason, the Tax Court concluded that the obligation to repay the director's fees arose from the subsequent agreement, not out of the "circumstances, terms, and conditions" of the original payment of the director's fees. *Id.* Thereupon, the Tax Court denied the taxpayer relief under Section 1341.

The decision in *Blanton* gave rise to the so-called "subsequent event" test which has been applied by several courts in denying a taxpayer relief under Section 1341. For example, in *Kraft v. United States*, 991 F.2d 292 (6th Cir.1993), the Sixth Circuit applied the subsequent event rationale of *Blanton* to deny Section 1341 relief to a doctor who had been convicted of fraud and sought to have his restitution payment treated as a repayment against salary received from his professional corporation in prior years. The Sixth Circuit held that, because the doctor made the restitution payment as part of his plea agreement relating to mail fraud and drug trafficking charges, the payment did not result from the same "circumstances, terms and conditions" under which he received his salary

from the corporation. *Id.* at 299. For that reason, the court held that the IRS properly had refused to apply Section 1341.

In *Bailey v. Commissioner*, 756 F.2d 44 (6th Cir.1985), the Sixth Circuit considered whether a taxpayer was entitled to Section 1341 relief where the income item was salary, dividends, and bonuses, and the repayment item was a fine imposed for violation of a consent decree. The court denied relief, finding that the payment "arose from the fact that Bailey violated the consent order, and not from the 'circumstances, terms, and conditions' of the original receipt of the salary and dividend payments." *Id.* at 47.

In *Usher v. Commissioner*, 40 T.C.M. (CCH) 385 (1980), the taxpayer received a total contractual payment of $200,000 from two people, and then paid $200,000 to a third party in settlement of that party's claim for breach of contract. The Tax Court held that relief under Section 1341 was unavailable because the settlement payment arose out of a contract different than those which had produced the previously reported $200,000 in income. *Id.* at 393. In so doing, the Tax Court observed that Section 1341 "does not apply where the taxpayer did, in fact, have an unrestricted right to receive the amount in the prior year and the obligation to repay arose as a result of subsequent events." *Id.*

The IRS also finds support for the subsequent event theory in *Pahl v. Commissioner*, 67 T.C. 286, 1976 WL 3655 (1976). In *Pahl*, a taxpayer received compensation from a corporation over a two-year period. After receiving most of that compensation, the taxpayer entered into an agreement to return to the corporation any amounts that were determined by the IRS not to be deductible. *Id.* at 287. A subsequent IRS audit concluded that some of that compensation was excessive and, hence, was not deductible. Thereupon, the taxpayer returned the amounts determined to be excessive. The refund included amounts

paid to the taxpayer both before and after he had executed the agreement to restore any compensation determined not to be deductible. *Id.*

In *Pahl*, the Tax Court held that the taxpayer's restoration of amounts received before execution of the agreement would not be eligible for Section 1341 relief but that the restoration of amounts received after execution of the agreement would be eligible for Section 1341 application. *Id.* at 289. The court reasoned that the repayment of the pre-agreement compensation did not arise out of the same "circumstances, terms, and conditions" of that compensation because, at the time the taxpayer received those funds, he had no obligation to restore them even if the corporation was not allowed deductions for them. *Id.* at 290. However, the court also concluded that the repayment of the post-agreement compensation did arise out of the "circumstances, terms, and conditions" imposed upon post-agreement compensation and applied Section 1341 to that extent. *Id.*

Finally, the IRS relies on Revenue Ruling 67–48, 1967 WL 15382, 1967–1 C.B. 50, to support its argument that DRI is not entitled to relief under Section 1341. There, the taxpayer was employed pursuant to a contract which contained a liquidated damages provision that obligated the taxpayer to pay specified damages to the employer if the taxpayer terminated his employment before the agreed term. *Id.* The taxpayer breached the contract by terminating before the end of the term and therefore paid liquidated damages as required by the contract. The IRS concluded that, under those facts, the taxpayer's repayment of the excess salary did not qualify under Section 1341 because, in the year the excess salary was received, the taxpayer had an unrestricted right to the salary, and the obligation to repay arose from a subsequent event, i.e., the taxpayer's early termination of employment. *Id.*

The IRS reads *Blanton, Kraft, Bailey, Pahl* and *Usher,* to articulate the principle that where, in the prior year, a taxpayer has an "actual unrestricted right" rather than the "appearance of an unrestricted right," Section 1341(a) does not apply. *See* Pl. Pre–Trial Exh. 41 at 22 (IRS Rpt. 526–36. Oct. 1, 1996). None of those decisions addressed or articulated that proposition and hence they simply cannot be stretched to support the construction of the statute here urged by the IRS. More importantly, contrary to the position taken by the IRS, neither the statute nor the controlling Treasury Regulation speak in terms of actual unrestricted rights annulled by subsequent events. Instead, both authorities use the language "appeared" and "unrestricted right" in the year of inclusion in gross income. And, both authorities make qualification for relief depend on the establishment in a later year that the right was not unrestricted. Thus, the temporal language in both the statute and the regulation addresses the subsequent determination that the earlier belief was wrong, not the subsequent occurrence of an event which annuls the previously perceived right. To the extent that *Blanton* and its progeny hold otherwise, they are flatly at odds with the statute and the Treasury Regulation.

■ However, it does not appear that *Blanton, Kraft, Bailey, Pahl, Usher,* or even Revenue Ruling 67–48, create such a conflict. First, it is essential to keep in mind that Section 1341 requires that there be some substantive nexus between the appearance of the unrestricted right and the defeasance of the right in a subsequent year. Second, it is important to read *Blanton* and its progeny in perspective of the facts there at issue and to understand what *Blanton* actually held. In each case, the taxpayer voluntarily took some action *after* the receipt of apparently unrestricted income which required the taxpayer to thereafter return the remuneration. *Blanton* and its progeny simply hold that, although such consensual *ex post facto* arrangements might be contractually binding on the taxpayer, they are insufficient to

trigger the benefits of Section 1341. *See Blanton,* 46 T.C. at 530 (holding that the circumstances which trigger Section 1341 must not arise out of circumstances, terms, and conditions *imposed upon such [prior] payment by reason of some subsequent agreement between payor and payee* ) (emphasis added).

A careful examination of *Blanton, Kraft, Bailey, Pahl, Usher* and Revenue Ruling 67–48 discloses that, in each instance, there was no substantive nexus between the appearance of an unrestricted right which had produced the included income and the circumstances which defeated the apparently unrestricted right. Understood then, in perspective of their facts and actual holdings, those authorities do not support the interpretation on which the IRS bases its contention respecting how Section 1341 is to be applied in assessing the claim for refund in this action.

Significantly, this is not the first action in which the IRS has attempted, unsuccessfully, to advance the so-called subsequent events test to narrow the ameliorative effect of Section 1341(a). And, as is the case here, those other efforts have not been accorded much hospitality.

For example, in *Prince v. United States,* 610 F.2d 350 (5th Cir.1980), the Fifth Circuit rejected much the same argument on which the IRS relies here. In *Prince,* a taxpayer received income in a prior year in the form of a distribution from a trust and a state court later required the taxpayer to return a portion of that income to the trustee because the trustee had miscalculated his fee and hence had made an excessive distribution to the taxpayer. *Id.* at 351. Thus, in a later year, the taxpayer was required to return $170,000. *Id.*

As it does here, the IRS contended in *Prince* that Section 1341 did not apply because, when the taxpayer received the disbursement in the prior year, she had an actual, unrestricted right to the trust income in question, and not just the "appearance" of such a right. *Id.* at 352. The Fifth Circuit rejected that argument, hold-

ing that the taxpayer was entitled to Section 1341 relief because:

> The [state court] judgment established, whether expressly or by implication, that the deductions from the trust income for the ten year fee had been miscalculated. As a result, Margaret Bush had received more income from the trust than she was entitled to receive. This income had to be returned. The requirements of Section 1341 were thus clearly satisfied. Margaret Bush appeared to have an unrestricted right to the income when she received it; it was established in a taxable year after she received it that she did not have such a right.

*Id.*

In *Van Cleave v. United States,* 718 F.2d 193 (6th Cir.1983), the Sixth Circuit agreed with the interpretation given Section 1341 in *Prince.* In *Van Cleave,* the taxpayer received salary payments of $332,000 which, at the time of receipt, were subject to a corporate by-law requiring repayment of salary to the extent it was deemed "excessive" and, therefore, not deductible by the corporation under Section 162. *Id.* at 194. In a later year, an audit by the IRS established that $57,-500 of the $332,000 salary was in fact "excessive," and the taxpayer repaid that amount in accordance with the by-law and the contractual agreement between the corporation and the taxpayer. *Id.*

In *Van Cleave,* the IRS argued that the taxpayer did not satisfy the "unrestricted right" requirement of Section 1341 because the IRS audit finding the salary to be excessive was a subsequent event which had occurred after the income had been received. *Id.* at 196–97. The Sixth Circuit rejected that argument, holding that:

> The fact that [the taxpayer's] ultimate right to the compensation was not determined until the occurrence of a subsequent event does not mean that [the taxpayer] had, in the statutory sense, an unrestricted right to the compensation

when he received it.... We agree with the Fifth Circuit's reading of Section 1341 [in *Prince* ] and hold that the fact that a restriction on a taxpayer's right to income does not arise until a year subsequent to the time of receipt does not affect the availability of Section 1341 tax adjustment. Therefore, Section 1341 tax adjustment is available to a taxpayer in this situation if the other requirements of the section are met. We are aided in this conclusion by our examination of cases involving the application of the claim of right doctrine, the effect of which the section was designed to alleviate. Acceptance of the government's reading of the statute would thwart the ameliorative purpose intended by Congress in enacting the section.

*Id.* at 197 (internal citations omitted).

The IRS contends here that the Fifth Circuit's decision in *Prince* supports, rather than contradicts, the "subsequent events" test because the taxpayer's repayment on account of the trustee's miscalculation of the fees arose from the circumstances, terms, and conditions of the trust from which the original funds were dispersed. The IRS also argues that *Van Cleave* does not undermine its subsequent events argument because the Sixth Circuit did not reject the "subsequent events" test, but rather, held that an IRS audit could not constitute such an event.

As explained above, reliance on the term "subsequent event" tends to confuse, rather than inform, the appropriate analysis. In all situations involving Section 1341, there will be some event which occurs in a year after the filing of the original tax return which will prompt the taxpayer to request a refund. The true focus of the inquiry is whether there is a substantive nexus between the right to the income at the time of receipt and the subsequent circumstances necessitating a refund.

For example, in *Prince,* the beneficiary's right to receive income from the trust was qualified by the condition that the income be calculated in accordance with the terms and provisions of the trust. The need to request a refund arose out of a failure to comply with the terms of the trust instrument which, in that case, supplied a substantive nexus between the refund and the apparently unrestricted right to the income at the time it was received. Similarly in *Van Cleave,* the taxpayers receipt of income was expressly conditioned on the corporations by-laws and the taxpayer's employment contract which both required return of income determined to be excessive. As in *Prince,* there was a substantive nexus between the apparently unrestricted right to the income and the basis for the refund. In contrast, *Blanton, Kraft, Usher,* and *Pahl* all involved taxpayers who voluntarily entered into agreements unrelated to the apparently unrestricted right to the income which was extant when it was received. Thus, in each of those cases, there was no substantive nexus between the right and its subsequent defeasance.

■ The question here then is whether there is a substantive nexus between Virginia Power's refund of $10,058,336 and Virginia Power's original receipt of that amount from its customers. The undisputed facts show that Virginia Power collected the approximately $10 million from its customers from 1975 through 1987 to pay deferred federal income taxes. Although Virginia Power knew that, in later years, it might be required to return a portion of that amount to its customers if it was no longer needed to pay taxes because of a change in the federal corporate tax rate, the facts available in the years of receipt showed an apparently unrestricted right to the income included in gross income in those years. However, inherent in the right to receive the income in those years was the risk that later the right could, to some extent, be defeated.

On this record, it is rather clear that the refund of the excess funds from the Deferred Tax Account arose out of the "circumstances, terms, and conditions" im-

posed upon Virginia Power's original collection of the funds. Therefore, unlike *Blanton* and its progeny, there is here a substantive nexus between the income event and the repayment event. Accordingly, DRI has satisfied the "unrestricted right" requirement for Section 1341 application for the reason that DRI reported an item of income in a prior year because it "appeared" it had an "unrestricted right" to such item, and it was later established that the taxpayer, in fact, did not have such a claim of right.

## C. The Allowable Deduction Requirement (Section 1341(a)(2))

The second aspect of the taxpayer's burden in proving entitlement to the application of Section 1341 is to demonstrate that it is entitled to deduct the item at issue under some provision of the Internal Revenue Code. *See, e.g., Wood v. United States*, 863 F.2d 417, 420 (5th Cir.1989).

Virginia Power argues that it is entitled to a deduction for the refunds it made to its customers in 1991 as ordinary and necessary business expenses incurred in carrying on its business under Section 162(a) of the Code. 26 U.S.C. § 162(a) (1986 and Supp.1998). The IRS asserts that the approximately $10 million refund to customers which is the subject of Count One was a reduction in Virginia Power's income, not an ordinary and necessary expense incurred in carrying on the company's business.

Under Section 162(a), the taxpayer is allowed a deduction for "all the ordinary and necessary expenses paid or incurred during the taxable year in carrying on a trade or business." Thus, to be deductible as a business expense Section 162(a) "the item must be-(a) 'paid or incurred' within the taxable year; (b) incurred in carrying on a 'trade or business'; and (c) both 'ordinary and necessary.'" *Hill v. Com-*

*missioner*, 181 F.2d 906, 908 (4th Cir. 1950).[6]

The determination of whether a particular activity qualifies as a trade or business is made on a case by case basis. *Higgins v. Commissioner*, 312 U.S. 212, 217–18, 61 S.Ct. 475, 478, 85 L.Ed. 783 (1941); *accord Commissioner v. Groetzinger*, 480 U.S. 23, 34–35, 107 S.Ct. 980, 987, 94 L.Ed.2d 25 (1987). However, in order to be engaged in a trade or business the taxpayer must be involved in an activity "with continuity and regularity" and "the taxpayer's primary purpose for engaging in the activity must be for income or profit." *Groetzinger*, 480 U.S. at 34–35, 107 S.Ct. at 987, 94 L.Ed.2d 25. Without question, Virginia Power's efforts in generating, transmitting and distributing electricity to the public qualifies as a trade or business within the meaning of Section 162.

The only issue that remains then, is whether the amount Virginia Power was ordered to refund to its customers qualifies as a "necessary and ordinary expense." In *Hill*, the Fourth Circuit observed that "[d]ictionary definitions of the words 'ordinary' 'necessary' and 'personal' afford scant assistance" in assessing whether a particular item qualifies as a deductible expense. *Hill*, 181 F.2d at 909. Therefore, *Hill* relied upon long standing opinions which had informed the meaning of those terms as follows:

> Frequently quoted is the observation of Mr. Justice Cardozo, in *Welch v. Helvering:* "Now, what is ordinary, though there must always be a strain of constancy within it, is none the less a variable affected by time and place and circumstance. Ordinary in this context does not mean that the payments must be habitual or normal in the sense that the same taxpayer will have to make them often. A lawsuit affecting the

6. There is no dispute that Virginia Power paid the refunds within the tax year that these items are sought to be deducted.

safety of a business may happen once in a lifetime. The counsel fees may be so heavy that repetition is unlikely. None the less, the expense is an ordinary one because we know from experience that payments for such a purpose, whether the amount is large or small, are the common and accepted means of defense against attack. The situation is unique in the life of the individual affected, but not in the life of the group, the community, of which he is a part. At such times there are norms of conduct that help to stabilize our judgment, and make it certain and objective. The instance is not erratic, but is brought within a known type." ... Said Mr. Justice Douglas, in *Deputy v. DuPont,*: 'One of the extremely relevant circumstances is the nature and scope of the particular business out of which the expense in question accrued. The fact that an obligation to pay has arisen is not sufficient. It is the kind of transaction out of which the obligation arose and its normalcy in the particular business which are crucial and controlling.'

*Hill,* 181 F.2d at 909–10 (internal citations omitted). Thus, the discernable general rule is that an expense will be deductible if it is causally related to the taxpayer's attempts to produce income, if it is common industry practice, or if it seems logically designed to increase or preserve the flow of receipts. The refunds paid by Virginia Power fit this general accepted definition of a deductible ordinary and necessary expense of doing business.

■ First, the refunds were directly related to Virginia Power's ongoing business as a public utility. The well-spring of the refunds was the income generated from the charges assessed by Virginia Power on its customers for the purchase of the company's product and services. In the year in which the refunds were made, the effect of the refund was to reduce Virginia Power's net gain from its profit-oriented activities for that year. As such, the one-time lump sum refund payments represented a cost to Virginia Power which was directly related to its income generating activities in its trade or business. Furthermore, there is nothing extraordinary about the refund expense incurred by Virginia Power. Even if this particular refund was an infrequent occurrence as to Virginia Power, the prospect of having to make it was imbedded in the rate structure by which the company conducted its affairs under the auspices of the Regulatory Authorities. And, similar direct refunds were commonplace events for the utility industry as a whole, particularly in response to the 1986 Tax Reform Bill. Under the facts here presented, the refund is therefore properly classified as an "ordinary and necessary" expense.[7]

The conclusion that "refunds" of overcharges to customer's qualify as deductible business expenses is also consistent with *United States v. Skelly Oil Co.,* 394 U.S. 678, 89 S.Ct. 1379, 22 L.Ed.2d 642 (1969). In *Skelly Oil,* the taxpayer was required to make refunds to certain customers that had been overcharged for natural gas in prior years. The parties were in disagreement as to *which* section of the tax code the refunds were deductible under, either as business expenses under Section 162 or losses under Section 165, but there was no dispute that the refunds were deductible. *See id.* at 685, 89 S.Ct. at 1384. In addition, there was no dispute in *Skelly Oil* that Section 1341 properly applied, the only issue being the proper amount of the claimed refund. *See id.*[8]

The IRS argues that *Skelly Oil* is not pertinent to this case because the payments there were made to the same customers who were overcharged in prior

---

7. There is no real dispute that the expense was necessary. Nor could there be. The refund was ordered by the Regulatory Authorities and failure to make it was simply not an option.

8. There is no dispute in this case as to the correctness of the calculated refund amount.

years. In contrast, the refunds here took the form of wire transfers, checks or one-time account credits to customers in 1991. Unsurprisingly, some customers had moved out of the area between the time of the overcharge and the time of the refund. And, some customers had moved into the area. However, refunds were made to classes of customers ·and generally were made to the classes and people who had been overcharged. Where possible, for Virginia Power's larger customers, refunds were made based on actual customer usage during the period of overcollection. In any event, because these refunds were made by utilities all over the country even people who moved out of the area received refunds from other utilities. And, people who moved into the area were given refunds against like overcharges by the utilities who had served the area from which they had moved.[9] In sum, the refunds here were made, within pragmatic, realistic parameters, to the same customers from whom the deferred tax component had been collected. And, Virginia Power followed the prevalent practice adopted by the industry as a whole. For those reasons, the fact that there was not a customer by customer refund is a distinction without a difference.

The IRS makes three arguments in support of its assertion that these refunds were reductions in income and not ordinary and necessary refunds. They will be considered in turn.

First, the IRS contends that, as a matter of law, the refunds are reduction, in income by virtue of the decisions in *Roanoke Gas Co. v. United States,* 977 F.2d 131 (4th Cir.1992); *Southwestern Energy Co. v. Commissioner,* 100 T.C. 500, 1993 WL 185898 (1993) and *Iowa Southern Utilities Co. v. United States,* 11 Cl.Ct. 868 (1987), aff'd. 841 F.2d 1108 (Fed.Cir.1988). Those decisions involved materially different factual circumstances than those pre-

sented here and, therefore, the decisions do not support the position taken by the IRS.

In *Roanoke Gas,* the Fourth Circuit considered whether a future rate adjustment by a public utility constituted a deductible business expense. It was the practice of the utility in that case to adjust its rates on a monthly basis to reflect estimated changes in the cost of gas purchased from outside suppliers. *Roanoke Gas Co.,* 977 F.2d at 133. In most months, the estimates did not accurately reflect the actual change in the price of gas and, as a result, the utility overcollected in some months and undercollected in others. *Id.* To remedy the imbalance, the company, at the end of each calendar year, compared its actual cost of gas with the amount of revenues collected from its customers based on the estimates. To the extent that the charges to customers had been excessive or deficient, the company would adjust its rates a second time, and this rate adjustment would be applied evenly over the succeeding twelve-month period. *Id.* Under its method of accounting, the utility reported the adjustment to its rates as either an increase or a decrease to income in the succeeding twelve-month period. *Id.*

In 1987, the utility was ordered by the VSCC to change its accounting method to a deferral method of accounting, pursuant to which the utility, which continued to prospectively adjust its rates, would report the amount of undercollections as income in the year of undercollection, and the amount of overcollections as a deduction in the year of over collection. *Id.* at 134. Based on the change to the deferral method of accounting, the utility filed amended income tax returns, and classified the overcollections returned to customers through a rate adjustment as a deductible business expenses under Section 162(a). *Id.*

---

**9.** Interest was included in the refunds paid to some, but not all, of the company's North Carolina customers; the company paid no interest to customers covered by the FERC refund order.

The Fourth Circuit rejected the utility's characterization, and held, instead, that the return of the overcollections, by way of rate adjustments, represented a regulation of income. *Id.* at 137. The Court of Appeals explained that: "Roanoke Gas' obligation to reduce rates through a future rate adjustment, even if imposed to account for past overcharges, does not constitute an expense, but merely foretells a rate adjustment that, when implemented, regulates income." *Id.* The Fourth Circuit based this conclusion largely on its findings that the prospective rate adjustment did not represent an obligation to repay the customers who were actually overcharged and that no payment was ever made, or credit shown, on a customer's bill. *Id.* at 136. The Court of Appeals also was influenced by the fact that, because the rate adjustment was prospective:

> [n]o effort is made to match 'refunds' with persons who overpaid or to assure that those who did not overpay did not receive refunds. The rate adjustment, applying to all sales of gas regardless of whether the customer was overcharged, operates simply to control the amount of income that Roanoke Gas may receive relative to its costs for natural gas measured on the previous year's experience and to assign the income to a given year.

*Id.* at 136. And, the Fourth Circuit emphasized that: (I) Roanoke Gas was not required to segregate the overcollected funds; (ii) there were no limitations placed on the use of the overcollected funds; and (iii) the utility was not required. to pay interest on the overcollected funds. *Id.*

The facts which animated the decision in *Roanoke Gas* were substantially different that those presented here. Quite unlike *Roanoke Gas,* here the Regulatory Authorities required Virginia Power to refund the deferred taxes through a one-time payment, and not by way of future reductions in rates. *See* Joint Stip. of Facts Nos. 37–47. Unlike *Roanoke Gas,* here Virginia Power made those refunds in that fashion. And, the refunds were allocated to actual customers where possible or to the classes of customers which had made the overpayments, thereby "matching-up" the refunds to the overpaying customers to the extent that it was feasible to do so.[10]

Furthermore, also unlike *Roanoke Gas,* the customers here were actually paid, receiving wire transfers, checks or one-time credits on their utility bills. And, significantly different than in *Roanoke Gas,* here, the prospective customer rates were regulated and adjusted without reference to the refund which the Regulatory Authorities required the utility to make.

In short, the Fourth Circuit concluded that the obligation to adjust future rates in *Roanoke Gas* possessed few, if any, of the characteristics inherent in a liability to refund past overcharges. *Id.* at 136. *See also, Houston Industries, Inc. v. United States,* 32 Fed. Cl. 202, 211 (1994). That simply is not true here. Indeed, in every important aspect, the facts of this action are materially different than those in *Roanoke Gas.* Hence, it does not control the disposition of this action.

In an effort to skirt these outcome determinative differences, the IRS asserts that the Regulatory Authorities have acknowledged (at least by implication) that there is no difference between "payments and credits" to customers and a future "rate adjustment." To support that view, the IRS relies on a 1981 FERC rule which provides that:

> The Commission agrees that tax laws and, particularly tax rates may change, ... The balance in the deferred tax reserve is therefore a residual of past tax costs over past tax payments and may or may not be sufficient to cover future tax payments over future tax

---

**10.** A precise matching is a factor to be considered where, as in *Roanoke Gas,* the period involved is a short one. Taking into account the lengthy time period involved, that degree of matching was not possible here. And, in any event, Mr. Bolton testified, without refutation, that the same procedure was followed across the nation.

costs, depending on the statutory tax rates in the future. Any excess or deficiency in the deferred tax reserve does not, however, result in a windfall to either shareholders or ratepayers since the *balances will systematically be subject to a reconciliation in future rates.* Differences in the Recognition of Expenses or Revenues for Ratemaking and Income Tax Purposes, 46 Fed.Reg. 26613, 26632 (1981) (emphasis added). That argument might be persuasive here but for the fact that the FERC and NCUC ordered a refund of the excess amounts and chose not to address the matter by ordering a future rate reduction.

The IRS also seeks to bolster its argument by reference to a 1996 NCUC declaratory order in which the NCUC concluded that, when a reserve account for deferred taxes becomes excess, an adjustment to the account may be accomplished through either an ongoing reduction in rates or a one-time refund to ratepayers. (Decl. Ord. of N.C. Util. Comm., Doc. No. E–2253363, at 4). That provision does not help the IRS because it simply outlines two methods to redress the imbalance: a refund—which was ordered here—or a future rate reduction which occurred in *Roanoke Gas.* Neither the FERC rule nor the NCUC order convert a prospective rate adjustment into a refund or vice versa.

Nor do the other decisions on which the IRS relies support its argument that the two methods of repayment should be treated identically for tax purposes. First, in *Southwestern Energy Co.,* 100 T.C. at 506, the Tax Court, on facts quite similar to *Roanoke Gas,* adopted the views of the Fourth Circuit in *Roanoke Gas,* in determining that the taxpayer was not entitled to a current deduction for overpayments that the utility was required to return to its customers through a reduction in future rates. Hence, *Southeastern Energy Co.* is no more applicable to these facts than is *Roanoke Gas.*

In *Iowa Southern Utilities Co.,* 11 Cl.Ct. at 870, the taxpayer, a regulated public utility, had collected surcharges from its customers to defray the construction expenses of a new power plant. The utility was required to return the surcharges to its customers through a reduction in rates over a thirty-year period. The Court of Claims held that the utility was not entitled to a current deduction for the amounts it was required to return to its customers over the succeeding thirty years because the return of the amounts would involve a reduction in income, as opposed to a deduction from income. *Id.* at 873. The court in *Iowa Southern* stated that:

A deduction, for federal income tax purposes, involves a cost or expenditure that is incurred in the process of producing income from a trade or business. We do not have that here. Granted, the language of the stipulation, and also that of the tariff sheets, speaks in terms of a "refund" of the surcharges. *But the fact of the matter is that these documents set up no obligation to pay; they establish no liability.* Rather, all that they accomplish is a declaration of regulatory policy: that rates shall be raised in certain years and then lowered in subsequent years to offset the increase. It suggests confusion in thought to argue that the expected future reduction in the charges for electric service qualify as a cost, i.e., a deduction, incurred in the process of producing the income generated through the allowed increase in charges. Perhaps in some broad economic sense there may be room for that sort of argument, but not in federal tax law. *The negative surcharges represent a price change; not a liability.* Accordingly, there existed no deductible expense to accrue.

*Id.* at 874 (emphasis added) (internal citations omitted).

Unlike *Iowa Southern, Southwestern Energy,* and *Roanoke Gas,* Virginia Power had an obligation to make a refund, not to make a future change in the price of service. Also, when ordered by the Regulatory Authorities, that obligation was a legal

liability binding on, and enforceable against, Virginia Power. Here, Virginia Power was actually out-of-pocket the payments it made and thus a deductible expense accrued in 1991 when Virginia Power made the one-time, lump sum refund payments or credits to its customers. Thus, in every significant respect, this action differs from *Southwestern Energy* and *Iowa Southern.*

The second argument advanced by the IRS is that Virginia Power's accounting records preclude a finding that the refunds constitute a deduction from income, rather than a reduction in income. Virginia Power recorded the payments and credits in its accounting records as a reduction to sales revenue, which represents a reduction to "income" under Section 61 of the Internal Revenue Code.

■ The IRS argues that, because Virginia Power recorded the refunds as a reduction in sales revenue, and not as a deductible expense, DRI is now bound by this accounting treatment. The argument has a superficial appeal but it does not withstand scrutiny.

The core of the IRS argument is that Section 446(a) of the Code requires DRI to be bound by its accounting treatment of the refunds for income tax purposes. Section 446(a) provides that "[t]axable income shall be computed under the method of accounting on the basis of which the taxpayer regularly computes his income in keeping his books." 26 U.S.C. § 446(a) (1998). This rule is further explained in Treasury Regulation § 1.446–1(a)(1), which states that "[t]he term 'method of accounting' includes not only the over-all method of accounting of the taxpayer but also the accounting treatment of any item."

■ Section 446 does not have the binding affect urged by the IRS. The purpose of Section 446 is to compel taxpayers to compute taxable income under a method which most accurately reflects the taxpayer's actual income for the tax year. *See e.g., Commissioner v. Kuckenberg,* 309 F.2d 202 (9th Cir.) *cert. denied* 373 U.S. 909, 83 S.Ct. 1296, 10 L.Ed.2d 411 (1963). To that end, the "method of accounting" regulations which implement Section 446 relate primarily to the proper timing for the inclusion of an item in income or the taking of a deduction and not to the ultimate tax treatment of an item or deduction. That is, Section 446 and its regulations address "when" an item is properly includable and not "what," as a substantive matter, is or is not taxable or deductible.

The record shows that Virginia Power's accounting records do not distinguish between reduction of gross income and deductions from gross income, and that both reductions of, and deductions from, income reduce the gross income amounts shown on Virginia Power's books. Thus, the binding force which the IRS seeks to draw from the company's accounting records is not available as a matter of accounting principle or logic.

■ More importantly, it has long been settled that compulsory accounting rules do not control tax consequences. *Old Colony R. Co. v. Commissioner,* 284 U.S. 552, 562,52 S.Ct. 211, 214, 76 L.Ed. 484 (1932). Here, Virginia Power recorded the refund amount in its books as a reduction to revenue because the prevailing FERC regulations dictated that accounting treatment.[11] Under these circumstances, the estoppel argument advanced by the IRS can be given no credence.

■ In any event, it is the substance of a transaction, and not its particular form, or the taxpayer's intent, which controls the determination of the resulting tax treatment of the transaction. *See e.g., Halle v. Commissioner,* 83 F.3d 649, 655 (4th Cir.1996). Therefore, the fact that,

11. Stuart Bolton, the financial controller of Virginia Power, so testified without refuta-tion. Hrng. 3/10/98, Trans. at 43:10–18.

under a taxpayer's accounting system, an expenditure is characterized as a reduction from income, is not controlling as to whether the expenditure is deductible as a business expense under the Internal Revenue Code. *See e.g., Eastman Kodak Co. v. United States,* 209 Ct.Cl. 365, 534 F.2d 252, 255–56 (Cl.Ct.1976) (fact that generally accepted principles of accounting favored matching compensation with related payroll taxes did not *ipso facto* mean that the same principle applied for tax purposes); *Ohmer Register Co. v. Commissioner,* 131 F.2d 682, 686 (6th Cir.1942) (fact that taxpayer, in his books, kept on accrual basis, carried balance which was owing on sales agents' commissions, and which was dependent upon collection of sales prices, under name "reserve for sales agents' commissions", was immaterial in determining whether that item was deductible as a "business expense"). Simply put, labels or book entries given to expenditures do not control their deductibility as expenses for purposes of Internal Revenue Code.[12]

Finally, the IRS argues that to accord the refunds the status of deductions would be tantamount to retroactive ratemaking, which occurs when an additional charge is made by a utility for a past service, or the utility is required to refund revenues collected pursuant to then lawfully established rates for past service. *See North Carolina v. Edmisten,* 291 N.C. 451, 232 S.E.2d 184, 194 (1977); *Associated Gas Distributors v. FERC,* 898 F.2d 809, 810 (D.C.Cir.1990). Retroactive ratemaking is prohibited because it ensures predictability in rates. *See Town of Concord v. FERC,* 955 F.2d 67, 75 (D.C.Cir.1992). Hence, says the IRS, deduction of the refunds as an expense should not be allowed because it would inject a lack of predictability in rates.

That argument is frivolous. First, the Regulatory Authorities were cognizant of the distinction between the methods of repayment when they ordered Virginia Power to make the refunds rather than ordinary future rate adjustments. In fact, Virginia Power originally requested that the excess deferred taxes be returned to taxpayers in the form of an adjustment to future rates, but then later requested that the return of the excess deferred taxes take the form of a refund, as opposed to a rate adjustment. The NCUC ordered that Virginia Power return the excess deferred taxes through a refund. So too did FERC. The Regulatory Authorities are presumed to have understood the concept of retroactive ratemaking and to have taken it into account in ordering the refunds.

Second, the determination of a tax issue, under the Internal Revenue Code, simply is not ratemaking. If the decision of the IRS or the courts, under the tax laws, have a subsequent effect on ratemaking, the Regulatory Authorities can consider that issue if and when it is presented to them. But, it is facile to be charitable, for the IRS to argue that the courts cannot construe the tax laws for fear of offending a principle that applies in the regulated

---

**12.** The IRS itself also previously expressed the view that it is irrelevant to the application of Section 1341 how a utility treats an item in its accounting books. For example, in one ruling, the IRS stated that, for purposes of Section 1341, "it makes no difference that × is authorized to, and does, refund the amounts through crediting a customer's bill." The fact that under x's method of accounting × reports such refunds as reductions in gross income rather than as deductions does not prevent × from meeting the requirements of Section 1341(a)(2)." Priv. Ltr. Rul. 8943018 (July 27, 1989), Priv. Ltr. Rul. 8942009 (July 18, 1989). Although these rulings were re-

voked by the IRS in 1996 based on the decisions in *Roanoke Gas, Southwestern Energy,* and *Iowa Southern,* which drew a tax distinction between current refunds and future rate adjustments, the revocation does not appear to alter the underlying premise that the IRS does not consider a taxpayer's treatment of the refund in its accounting system to be binding in a later tax proceeding under Section 1341.

Furthermore, a contrary rule would have the result of allowing a taxpayer to decide tax consequences of transactions by choosing an accounting method.

activity of making rates for utility companies.

## CONCLUSION: COUNT ONE

The Court finds that DRI has satisfied both prerequisites to obtaining Section 1341 relief, and thus, that it is entitled to a refund in the undisputed amount of $1,204,283.

## FINDINGS OF FACT: COUNT TWO

In Count Two, DRI claims a tax refund for expenditures incurred in remedying environmental contamination of an abandoned power plant. In 1901, Virginia Power constructed a hydroelectric generating facility on property located at 12th Street in Richmond, Virginia ("12th Street property"). In 1923, the company constructed a steam-fired electric generating facility on the 12th Street property. In 1973, the plant was shut down and Virginia Power decommissioned the facility by removing all the electric generating equipment. No electric generating activities have been conducted at the 12th Street property since then. The property does not contain any useable equipment or furnishings.

Virginia Power commenced a corporate reorganization in 1983 by which DRI, a holding company, was created, and Virginia Power became one of DRI's operating subsidiaries. In 1986, DRI created DLI, another operating subsidiary and a sister company to Virginia Power. DLI was chartered to engage in the business of real estate development including the buying, developing, operating, and selling of real estate.

Virginia law limits the activities of a public service company to activities that are "related to or incidental to its stated business as a public service company." Va.Code Ann. § 13.1–620(D) (1950 and Supp.1997). As a result, the VSCC required that all non-regulated activities of the DRI/Virginia Power group be conducted by members of the group other than Virginia Power. Development of the 12th Street facilities would be a non-regulated activity. The sale of the property to an unrelated third party, however, would not have been considered a non-regulated activity.

In 1986 and 1987, Virginia Power transferred to DLI six parcels of real estate, including the 12th Street property. DLI paid Virginia Power $870,167 for the 12th Street property.[13] In accordance with the rules for filing consolidated returns,[14] DRI did not report any gain or loss in its 1987 federal income tax return with respect to the transfer.

From June 1 to November 30, 1989, DLI listed the 12th Street property for sale with Morton G. Thalhimer, Inc., a real estate broker. In late 1989, DLI and Richmond Renaissance, Inc. ("Richmond Renaissance"), a local non-profit organization, discussed the possibility that DLI would donate the 12th Street property to Richmond Renaissance. In anticipation of that charitable transfer, an environmental assessment of the 12th Street property was conducted by Espey, Huston & Associates. The environmental assessment identified, in the electric steam generator plant and the hydroelectric plant, asbestos-containing materials,[15] oil containing

13. In response to a request by Virginia Power, the transfer of the 12th Street property to DLI was made pursuant to an Order of the VSCC. The VSCC required that Virginia Power's transfer of the property to DLI be at a bargain price half-way between the book value and the average fair market value, based on appraisals, of the 12th Street property.

14. Under 26 C.F.R. § 1.1502–13, a group of related corporations such as DRI, Virginia Power, and DLI do not report any gain or loss

in connection with an intercompany transfer of power until the property is disposed of outside of the corporate group.

15. The asbestos-containing materials found in the electric steam generator plant included white floor tile, transite panels, electrical wire wrap, rope, red and green floor tile, white block pipe insulations, white block duct insulation, white block beam insulation, vibration dampers, mudded pipe fittings, and fire doors. The asbestos-containing materials

polychlorinated hydrocarbons (PCBs), and other compounds listed as "hazardous substances" or "extremely hazardous substances" by the Environmental Protection Agency ("EPA").

The discovery of the asbestos-containing materials and the other contaminants caused DLI and Richmond Renaissance to suspend their discussions relating to the potential contribution by DLI of the 12th Street property to Richmond Renaissance. Thereafter, during May–June 1990, DLI had discussions with the Martin Agency concerning DLI's possible development and lease of a portion of the property which would include more than 100,000 square feet of commercial office space for the Martin Agency. According to Donald Priest, the vice president of DLI, the Martin Agency's proposal involved the demolition of certain buildings on the site, but demolition could not be undertaken unless the asbestos was first removed.

In April 1990, DLI hired PSI–Hall Kimbrell ("PSI") to act as project manager for the removal of contaminated materials at the 12th Street property. By agreement dated August 22, 1990, DLI also contracted with BFI Stephens ("BFI") to remove the asbestos-containing materials from the property. Although PSI informed DLI that EPA rules and regulations did not require the removal of asbestos in portions of the roofs of the 12th Street property, DLI directed BFI to remove asbestos-containing materials from the roofs so as to minimize or avoid future asbestos related liability.

During the removal of the asbestos-containing materials, BFI pumped water out of the lower level of the 12th street facilities, and that process revealed the presence of a large accumulation of contaminated sludge. DLI thereafter retained PSI to serve as a consultant with respect to the sludge removal and to secure pro-posals from contractors to perform the remediation associated with, and occasioned by, the sludge removal. Subsequently, BFI began removal of the sludge. In the fall of 1990, during the sludge removal process, BFI discovered other conditions requiring remedial action, including the presence of eleven fluid-filled 55–gallon drums, three electrical transformers, a large fluid-filled vat, four gas cylinders, two tanks, and twenty oil circuit breakers. This material was removed and disposed of by OHM Corporation ("OHM").

The work performed by PSI, BFI, and OHM was concluded in 1992. Other than the improvements inherent in the elimination of the contaminants, no other improvements to the 12th Street property were made between 1989 and 1992. Donald Priest, Vice–President of DLI, testified that DLI did not plan to renovate the 12th Street property, and that it had engaged in the environmental renovation because of fears of liability to trespassers or to third-parties down river if the property were flooded. Priest testified also that there is no current plan to convert the 12th Street property to another use or to further rehabilitate the property. A few years ago, DRI considered using the 12th Street property for its own headquarters, but, according to Priest, the idea has not been pursued and likely would not be. Priest also opined that the facilities would not be suitable for use as a warehouse because the building would have to be completely reconstructed.[16]

During 1990 and 1991, DLI paid $3,234,-240 in connection with the environmental clean-up of the 12th Street property. Of that amount, DLI's costs associated with removing the asbestos-containing materials, sludge, containers, and other contaminants from the 12th Street property and otherwise cleaning up the environmental

found in the hydroelectric plant included transite covers, transite panels, rope, electric wire wrap, white block pip insulation, mudded pipe fittings, and fire doors.

16. Priest testified that there would be no environmental restrictions on demolition of the buildings because the asbestos has been removed.

contamination at the facilities for 1991 totaled $2,242,232. DLI contends that it was entitled to deduct in 1991 the costs associated with the environmental clean-up of the 12th Street property, and that the IRS improperly disallowed that deduction. The parties agree that if DLI is entitled to the deduction it seeks, the amount of the refund is $764,135.

## CONCLUSIONS OF LAW: COUNT TWO

The issue presented in Count Two is whether the environmental remediation expenditures are deductible under Section 162 of the Internal Revenue Code as "incidental repairs" to the 12th Street property, or whether the expenditures adapted the property to a new and different use, and therefore, must be capitalized pursuant to Section 263 of the Code.

### A. Statutory Framework of Sections 162 and 263

Section 162 authorizes the deduction of "all the ordinary and necessary expenses incurred during the taxable year in carrying on any trade or business." 26 U.S.C. § 162 (1986 and Supp.1998). Under the implementing regulations, "[t]he cost of incidental repairs which neither materially add to the value of the property nor appreciably prolong its life, but keep it in an ordinarily efficient operating condition, may be deducted as an expense." 26 C.F.R. § 1.162–4 (1998). Further, "[r]epairs in the nature of replacements, to the extent that they arrest deterioration and appreciably prolong the life of the property, shall either be capitalized and depreciated in accordance with section 167 or charged against the depreciation reserve if such an account is kept." *Id.*

Under Section 263, however, no deduction may be taken for any amount paid out for "... permanent improvements or betterments made to increase the value of any property or estate," 26 U.S.C. § 263 (1986 and Supp.1998). The corresponding regulations likewise provide that the cost of repair work that adds to the value or substantially prolongs the useful life of property or adapts such property to a new or different use must be capitalized. 26 C.F.R. § 1.263(a)–1(b) (1998).

If a deduction is allowable under Section 162, an immediate tax benefit accrues because the taxpayer is permitted to reduce its taxable income in the current tax year. In contrast, if an item is capitalized, no immediate deduction is taken. Rather, the tax benefit is deferred until a later year either by way of depreciation "deductions" under Sections 167 or 168, or by means of an adjustment to the tax basis of the property under Section 1016. Thus, a taxpayer does not forever forfeit any tax benefit simply because Section 263 requires that an item be capitalized, rather the benefits are forestalled only until the property is used in a trade or business or otherwise disposed of.

Additionally, the capitalization provisions of Section 263 take precedence over the deduction provisions in Section 162. 26 U.S.C. § 161 (1986). Accordingly, the Supreme Court of the United States has held that deductions under Section 162 are exceptions to the norm of capitalization required by Section 263. *See INDOPCO v. Commissioner,* 503 U.S. 79, 84, 112 S.Ct. 1039, 1043, 117 L.Ed.2d 226 (1992). And, Section 263 prevents a taxpayer from taking a current deduction for an expenditure more properly attributable, through depreciation or an adjustment to basis, to income produced in future years. *See Commissioner v. Idaho Power Co.,* 418 U.S. 1, 16, 94 S.Ct. 2757, 2766, 41 L.Ed.2d 535 (1974). In assessing whether an expense is capital in nature it is necessary to focus on whether the taxpayer realizes benefits beyond the year in which the expenditure is incurred because production of a significant long-term benefit is one reason why an expense should be capitalized. *INDOPCO,* 503 U.S. at 87, 112 S.Ct. at 1044–45. Hence, it is necessary to ascertain the duration and extent of benefits

realized by the taxpayer. *Id.* at 88, 112 S.Ct. at 1045.

To deduct the costs associated with environmental remediation of the 12th Street property, DRI must demonstrate that the costs of remediation were for incidental repairs to keep the property in an efficient operating condition. If on the other hand, it is shown that the clean-up efforts adapted the property to a new and different use, capitalization of the costs would be required.

## B. Incidental Repairs: The "Put" vs. "Keep" Distinction

DRI argues that the clean-up of the 12th Street property did nothing more than eliminate hazardous conditions and the liability associated with those conditions. DRI contends that the value and life of the power station is no greater now than before the environmental remediation work was commenced. Under this view, the remediation efforts therefore are properly deductible because they neither increased nor prolonged the life or value of the 12th Street property as a power generating station. DRI further contends that the clean-up did not adapt the 12th Street property to a new and different use because after completion of the remediation efforts, the status of 12th Street property as a former electricity-generating plant was unchanged. Because of the unsuccessful negotiations with Richmond Renaissance and the Martin Agency, DRI concedes, as it must, that, before undertaking the remediation activities, it was aware that the 12th Street property could be adapted to office, retail, and/or entertainment uses. Nonetheless, DRI argues that the remediation efforts are properly deductible because they, in fact, did not adapt the property to any of those alternative uses.

In contrast, the IRS takes the position that removal of the environmental contaminates was essential in order to make any alternative use of the property a realistic, viable and practical option. Therefore, according to the IRS, the expenditures to remove the contaminates adapted the power plant to a new use, that of real estate development. Because the property was adapted to a new and different use, the costs incurred in 1991 to remediate the property are capital expenditures under Section 263 and not deductible expenses under Section 162.

 The analysis begins by accepting the premise that any repair inherently confers some measure of positive value to the property to which the repair is made. *See e.g. Plainfield–Union Water Co. v. Commissioner,* 39 T.C. 333, 338, 1962 WL 1262 (1962) (noting that "any properly performed repair adds value as compared with the situation existing immediately prior to that repair"). However, that theoretical, inherent contribution to value does not control the outcome here because, as recognized by the court in *Plainfield–Union,* the proper test for determining whether the cost of repair work must be capitalized is "whether the expenditure materially enhances the value, use, life expectancy, strength, or capacity [of the property] as compared with the status of the asset prior to the condition necessitating the expenditure." *Id.* With this in mind, a survey of the decisions which have examined the distinction between deductible "repairs" and non-deductible "capital expenditures" require the conclusion that DRI is not entitled to a deduction for the costs incurred by DLI in the environmental remediation of the 12th Street property.

In *Illinois Merchants' Trust Co., Executor,* 4 B.T.A. 103(1926), the Board of Tax Appeals ("BTA") court considered whether the cost of repairing rotting support pilings in a warehouse was deductible as an ordinary expense. The taxpayer in *Illinois Merchants* leased a warehouse located on the Chicago River. When the river unexpectedly receded, the pilings which supported the warehouse were exposed to the elements and subsequently began to rot. The BTA found that the costs incurred to repair the rotting piles were deductible

because they were incurred to prevent the total loss of the building and to keep the property in its ordinary operating condition as a warehouse. *Id.* 106–07. In reaching that decision, the BTA noted that:

> A repair is an expenditure for the purpose of *keeping the property in an ordinarily efficient operating condition.* It does not add to the value of the property, nor does it appreciably prolong its life. *It merely keeps the property in an operating condition over its probable useful life for the uses for which it was acquired.* Expenditures for that purpose are distinguishable from those for replacements, alternations, improvements or additions which prolong the life of the property, increase its value, or make it adaptable to a different use.

*Id.* at 106 (emphasis added). This rule was more definitively expressed as a "put" versus "keep" distinction by the Third Circuit in *Estate of Walling v. Commissioner,* 373 F.2d 190 (3rd Cir.1967), wherein the Third Circuit explained that:

> The test which normally is to be applied is that if the improvement were to "put" the particular capital asset in efficient operating condition, then they are capital in nature. If however, they were made merely to "keep" the asset in efficient operating condition, then they are repairs and are deductible.

*Id.* at 192–93 (internal citations omitted).

In *E. Russell Jones v. United States,* 279 F.Supp. 772 (D.Del.1968), the court applied the *Walling* test in determining whether a taxpayer's expenditures to rehabilitate a mansion qualified as deductible incidental repairs. In *E. Russell Jones,* the taxpayer inherited a mansion and, for the ensuing fifteen years, no efforts were undertaken to improve, repair or maintain the property. *Id.* at 773. As a result of this prolonged inattention, the property unsurprisingly fell into a state of disrepair. *Id.* Thereafter, the taxpayer expended large sums of money on the mansion and claimed a deduction for "repairs to rental property." *Id.* Relying on *Walling,* the court disallowed the deduction because "the evidence ... demonstrate[d][sic] that the expenditures made in connection with the mansion were *essential to 'put' it in* a rentable condition and were *not made to 'keep' it in* that condition." *Id.* at 776 (emphasis added).

Finally, the Fifth Circuit adopted the "put" or "keep" test in *Joseph Jones v. Commissioner,* 242 F.2d 616 (5th Cir.1957) a case which is strikingly similar to this one. In *Joseph Jones,* the taxpayer acquired a building as part of the liquidation of his solely owned corporation. *Id.* at 617. Before the taxpayer acquired the property, it had been found to be unfit for habitation by the state authorities. *Id.* In order to "put the building into such condition as would permit it again to be used and be productive of income," the taxpayer expended sums to overhaul and rehabilitate the property. *Id.* at 617–18. Because the expenditures "put" the building into a newly profitable condition, the court disallowed the deduction and required, instead, that the costs to be capitalized. *Id.* at 620.

Here, unlike *Illinois Merchants,* there were no ongoing operations at the 12 Street property which would be impeded if the repairs were not made. Indeed, the power plant had not been used since it was decommissioned in 1973 and there is no evidence to suggest that DLI, a company formed by DRI to engage in the business of real estate development, had any plans to reactivate the defunct facility for the generating of electricity. On this record, it cannot be said that the repairs were made to keep the 12th Street property in its ordinary efficient operating condition because at the time of the repairs the facility was not operating for any purpose.

Rather, the record here shows that, like the expenditures in *E. Russell Jones,* which put the property there into a "rentable" condition, the expenditures here were essential to put the 12th Street property into a "conveyable" or "developable" condi-

tion. First, Virginia Power transferred the property to DLI precisely because it could not use the property as a generating station and because development of the property for other uses was not "related to or incidental to" its regulated ongoing utility business. *See* Plain. Pre–Trial Br. at 20. It is undisputed that DLI attempted unsuccessfully to develop or convey the property. For example, the property was listed for sale with a real estate broker from June through November 1989. Then, late in 1989, DLI had discussions with Richmond Renaissance about contributing the property to Richmond Renaissance's ongoing revitalization of the city's riverfront area. These negotiations were terminated by Richmond Renaissance upon discovery of the contamination.

In May–June 1990, DLI had discussions with the Martin Agency about the possible development and lease of a portion of the property for use as commercial office space. These negotiations also failed because the existence of asbestos prevented the demolition of the buildings as proposed by the Martin Agency.

Finally, DLI considered developing the property for use as its corporate headquarters, however, under state law, DLI could not obtain a permit to renovate the property without first removing the asbestos.

In short, without removing the contamination from the facility, DLI could not sell, develop or even give the property away. Therefore, it is clear that the environmental clean-up enhanced the efforts to develop the property and therefore adapted the property to a new and different use from its previous status as a power generating facility. Because the environmental remediation "put" the property in a condition to be used in DLI's real estate development business, the costs associated with

the clean-up can not be deducted but rather must be capitalized.

DRI relies on Revenue Ruling 94–38 for the proposition that environmental clean-up costs are deductible under Section 162. In that ruling, the IRS held that environmental clean-up costs incurred in connection with the *ongoing operation* of a manufacturing plant are properly deductible under Section 162. *See also Plainfield-Union*, 39 T.C. at 337 (emphasis added) (allowing a deduction for repairs to a water pipe because they "restored the original carrying capacity of the pipe.... Such pipe was previously and thereafter continued to be used in the normal course of petitioner's operations as a water company"). As already discussed, the power plant at the 12th Street property was, and remains, abandoned and decommissioned. Because there are no ongoing operations, DRI's reliance on that ruling is therefore misplaced.[17]

Finally, DRI draws support from *Plainfield-Union* for its argument that the costs are deductible because the environmental clean-up added no value to the property. Although it is true that, in *Plainfield-Union*, the court concluded that an absence of increased value would weigh in favor of finding a deductible expense, *Plainfield-Union*, 39 T.C. at 337, that was only one of several factors to consider and thus, even if shown by the evidence here, it would not control the outcome in this case.

In any event, the suggestion that no value was added to the property in this case is squarely at odds with the evidentiary record. When the 12th Street property was transferred to DLI in 1987, its average appraised market value was $1,596,250. See Plain. Trial Exh. 38 (Application of June 6, 1986 to VSCC for approval of transfer of properties). In 1989, a fol-

---

**17.** For the same reason, DRI's argument that Revenue Ruling 94–38 supports the conclusion that Virginia Power, as the contaminating entity, would have been able to deduct the expenses is likewise incorrect. Therefore,

DRI's argument that it should be allowed to claim the deduction which Virginia Power would have been entitled too if it had retained the property is without merit.

low-up appraisal was conducted in connection with the potential contribution of the property to Richmond Renaissance. Hrng. 03/10/98, Trans. at 76:19–22 (testimony of Donald Priest, president of DLI). A critical assumption of the 1989 appraisal was that the asbestos and other contaminates on the property would be removed. *See* Plain. Initial Pre–Trial Brief at Exh. 17. The 1989 appraisal estimated that the revised market value of the property was $9,000,000, an increase of more than 500% from the fair market value in 1986. *Id.* Thus, the record does not support DRI's contention that no "value" was added to the property by removing the environmental contaminates.

## CONCLUSION: COUNT TWO

For the foregoing reasons, it seems rather clear that the "put versus keep" distinction requires capitalization of the clean-up expenses which are at issue in this action because the environmental remediation adapted the property to the new and different use in DLI's real estate development business.[18]

## CONCLUSION: SUMMARY

As to Count One, because the prerequisites for application of the section are met, the Court finds that the plaintiff is entitled to section 1341 relief with respect to the $10,058,336 that it refunded to its customers in 1991. Accordingly the IRS must refund to the plaintiff the undisputed amount of $1,204,283 with such interest as is due under law. Judgment shall be entered in favor of the plaintiff in that amount. The parties shall file by March 19, 1999 an agreed order reflecting the judgment amount calculated to reflect all interest, pre-judgment and the rate of post-judgment interest.

As to Count Two, the Court finds that the expenses incurred for environmental

remediation of the 12th Street Property "put" the property into a usable condition for DLI's real estate development business and did not "keep" the property in its previous operating condition as an electric power plant. Accordingly, the plaintiff is not entitled to deduct the expenses under Section 162 and therefore, judgment shall be entered in favor of the defendant on Count Two.

The Clerk is directed to send a copy of this Memorandum Opinion to all counsel of record. The Clerk is directed not to send copies by "electronic or computer means" unless explicitly directed.

It is so ORDERED.

---

**18.** This resolution makes it unnecessary to address the alternative arguments by the IRS that the remediation expenditures must be capitalized as part of a "general plan of reha-

bilitation of the property" or that asbestos removal always constitutes a permanent improvement which must be capitalized.